Slip Op. 18-67

## UNITED STATES COURT OF INTERNATIONAL TRADE

JIANGSU SENMAO BAMBOO AND
WOOD INDUSTRY CO., LTD., et al.,

    Plaintiffs,

and

GUANGDONG YIHUA TIMBER
INDUSTRY CO., LTD., et al.,

    Plaintiff-Intervenors,

v.

UNITED STATES,

    Defendant,

and

COALITION FOR AMERICAN
HARDWOOD PARITY, et al.,

    Defendant-Intervenors.

**Before: Timothy C. Stanceu, Chief Judge**

**Consol. Court No. 15-00225**

## OPINION AND ORDER

[Remanding to the agency a determination in an administrative review of an antidumping duty order of certain multilayered wood flooring from the People's Republic of China]

Dated: June 8, 2018

*Jeffrey S. Neeley*, Husch Blackwell LLP, of Washington, D.C., argued for plaintiffs and defendant-intervenors Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., Baishan Huafeng Wooden Product Co., Ltd., Changbai Mountain Development and Protection Zone Hongtu Wood Industrial Co., Ltd., Chinafloors Timber (China) Co., Ltd., Dalian Kemian Wood Industry Co., Ltd., Dalian Qianqiu Wooden Product Co., Ltd., Dasso Industrial Group Co., Ltd., Dongtai Fuan Universal Dynamics, LLC., Dun Hua Sen Tai Wood Co., Ltd., Dunhua City Wanrong Wood Industry Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., Guangzhou Panyu Kangda Board Co., Ltd., Hunchun Forest Wolf Wooden Industry Co., Ltd., Jiafeng Wood (Suzhou) Co., Ltd.,

Jiangsu Guyu International Trading Co., Ltd., Jiangsu Kentier Wood Co., Ltd., Jiangsu Mingle Flooring Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Jiashan HuiJiaLe Decoration Material Co., Ltd., Jilin Forest Industry Jinqiao Flooring Group Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd., Nanjing Minglin Wooden Industry Co., Ltd., Puli Trading Limited, Shanghai Lizhong Wood Products Co., Ltd./The Lizhong Wood Industry Limited Company of Shanghai/Linyi Youyou Wood Co., Ltd., Suzhou Dongda Wood Co., Ltd., Tongxiang Jisheng Import And Export Co., Ltd., Zhejiang Fudeli Timber Industry Co., Ltd., and Zhejiang Shiyou Timber Co., Ltd.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiffs Dunhua City Jisen Wood Industry Co., Ltd. and Yingyi-Nature (Kunshan) Wood Industry Co., Ltd. With him on the brief were *Alexandra H. Salzman*, *James K. Horgan*, and *Judith L. Holdsworth*.

*Jill A. Cramer*, Mowry & Grimson, PLLC, of Washington, D.C., argued for plaintiff, plaintiff-intervenor, and defendant-intervenor Fine Furniture (Shanghai) Limited. With her on the brief were *Kristin H. Mowry*, *Jeffrey S. Grimson*, and *Sarah M. Wyss*.

*Harold D. Kaplan*, Hogan Lovells US LLP, of Washington, D.C., for plaintiffs Armstrong Wood Products (Kunshan) Co., Ltd. and Armstrong Flooring, Inc. With him on the brief was *Craig A. Lewis*.

*Mark R. Ludwikowski*, Clark Hill PLC, of Washington, D.C., for plaintiff and plaintiff-intervenor Lumber Liquidators Services, LLC.

*Ronald M. Wisla*, Kutak Rock LLP, of Washington, D.C., argued for plaintiffs, plaintiff-intervenors, and defendant-intervenors BR Custom Surface, CDC Distributors, Inc., CLBY Inc. *doing business as* D&M Flooring, Custom Wholesale Floors, Inc., Dalian Penghong Floor Products Co., Ltd., Doma Source LLC, Dunhua City Hongyuan Wooden Products Co., Ltd., Galleher Corporation, HaiLin LinJing Wooden Products, Ltd., Hangzhou Hanje Tec Co., Ltd., Hangzhou Zhengtian Industrial Co., Ltd., Huzhou Chenghang Wood Co., Ltd., Huzhou Fulinmen Imp. & Exp. Co., Ltd., Metropolitan Hardwood Floors, Inc., Mudanjiang Bosen Wood Industry Co., Ltd., Nakahiro Jyou Sei Furniture (Dalian) Co., Ltd., Pinnacle Interior Elements, Ltd., Real Wood Floors, LLC, Shanghai Eswell Timber Co., Ltd., Shanghai Shenlin Corporation, Shenyang Haobainian Wooden Co., Ltd., Shenzhenshi Huanwei Woods Co., Ltd., Swiff Train Co., Timeless Design Import LCC, V.A.L. Floors, Inc., Wego Chemical & Mineral Corp., Xuzhou Shenghe Wood Co., Ltd., Zhejiang Dadongwu Greenhome Wood Co., Ltd., Zhejiang Fuma Warm Technology Co., Ltd., Zhejiang Longsen Lumbering Co., Ltd., and Zhejiang Tianzhen Bamboo & Wood Development Co., Ltd. With him on the brief was *Lizbeth R. Levinson*.

*John R. Magnus*, Tradewins LLC, of Washington, D.C., for plaintiff, plaintiff-intervenor, and defendant-intervenor Old Master Products, Inc. With him on the brief was *Sheridan S. McKinney*.

    *Jonathan M. Zielinski*, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for plaintiff-intervenor Guangdong Yihua Timber Industry Co., Ltd.  With him on the brief was *Thomas M. Beline*.

    *Jeffrey S. Levin*, Levin Trade Law, P.C., of Bethesda, MD, for plaintiff and defendant-intervenor Coalition for American Hardwood Parity.

    *Tara K. Hogan*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for defendant United States.  With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel was *Mercedes C. Morno*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

    Stanceu, Chief Judge:  In this consolidated action, numerous parties contest the final determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), issued to conclude the second periodic administrative review of an antidumping duty order on multilayered wood flooring from the People's Republic of China ("China" or the "PRC").  Concluding that the contested determination is contrary to law in certain respects, the court remands the determination to Commerce for reconsideration and correction as appropriate.

## I. Background

### A.  The Contested Decision

    The determination contested in this litigation (the "Final Results") is *Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Results of New Shipper Review; 2012-2013*, 80 Fed. Reg. 41,476 (Int'l Trade Admin. July 15, 2015) ("*Final Results*").[1]  Incorporated by reference in

---

[1] After issuing the decision contested in this action, Commerce published two corrections, neither of which involved matters relevant to this litigation.  *See Multilayered Wood Flooring From the People's Republic of China: Correction to the Final Results of Antidumping Duty Administrative Review*, 80 Fed. Reg. 49,986 (Int'l Trade Admin. Aug. 18, 2015); *Multilayered Wood Flooring From the People's Republic of China: Correction to the Final Results of* (continued . . .)

the Final Results is the Department's issues and decision memorandum ("Final Issues and

Decision Memorandum").  *Issues and Decision Mem. for the Final Results of 2012-2013*

*Antidumping Duty Administrative Review of Multilayered Wood Floor from the People's*

*Republic of China* (Int'l Trade Admin. July 8, 2015) (P.R. Doc. 418), *available at*

https://enforcement.trade.gov/frn/summary/prc/2015-17368-1.pdf (last visited June 5, 2018)

("*Final I&D Mem.*").

<u>B.  Proceedings before Commerce</u>

Commerce issued the antidumping duty order on multilayered wood flooring from the

PRC (the "Order") in late 2011.  *Multilayered Wood Flooring from the People's Republic of*

*China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty*

*Order*, 76 Fed. Reg. 76,690 (Int'l Trade Admin. Dec. 8, 2011).  Commerce identified the

"subject merchandise," i.e., the merchandise that is subject to the Order, as "multilayered wood

flooring" ("MLWF") but stated that this merchandise "is often referred to by other terms, e.g.,

'engineered wood flooring' or 'plywood flooring.'"  *Id.* at 76,690.  The Order defines such

flooring generally as "composed of an assembly of two or more layers or plies of wood

veneer(s)" in which "[t]he several layers, along with the core, are glued or otherwise bonded

together to form a final assembled product."  *Id.* (footnote omitted).

In December 2013, Commerce announced the opportunity for interested parties to request

a review of the Order.  *Antidumping or Countervailing Duty Order, Finding, or Suspended*

*Investigation; Opportunity to Request Administrative Review*, 78 Fed. Reg. 72,636 (Int'l Trade

Admin. Dec. 3, 2013).  The Coalition for American Hardwood Parity (the "Coalition"), the

------------------------------------------------------------

(. . . continued)

*Antidumping Duty Administrative Review*, 80 Fed. Reg. 52,447 (Int'l Trade Admin.
Aug. 31, 2015).

petitioner in the antidumping duty investigation culminating in the Order (and a plaintiff and defendant-intervenor in this litigation), requested that Commerce review 91 Chinese exporter/producers of the subject merchandise, and 45 additional interested parties also requested a review. *See Multilayered Wood Flooring From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 1,388 (Int'l Trade Admin. Jan. 9, 2015) ("*Prelim. Results*"). Commerce initiated the second periodic administrative review of the Order ("second review") on February 3, 2014, covering the period of December 1, 2012 through November 30, 2013 (the "period of review" or "POR"). *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 79 Fed. Reg. 6,147 (Int'l Trade Admin. Feb. 3, 2014).

On April 21, 2014, Commerce determined it impracticable to examine individually all of the respondents subject to the review and, therefore, selected the two largest exporters during the POR, Dalian Dajen Wood Co., Ltd. ("Dalian Dajen") and Zhejiang Layo Wood Industry Co. Ltd. ("Layo Wood"), as "mandatory respondents," i.e., exporter/producers whose sales of subject merchandise during the POR Commerce would examine individually and to whom Commerce intended to assign individual weighted-average dumping duty margins. *See Selection of Respondents for the 2012-2013 Administrative Review of the Antidumping Duty Order on Multilayered Wood Flooring from the People's Republic of China at 3-7* (Int'l Trade Admin. Apr. 21, 2014) (P.R. Doc. 161) ("*Respondent Selection Mem.*"). Because Layo Wood was excluded from the Order as a result of litigation stemming from the final determination that culminated in issuance of the Order, *see Baroque Timber Industries (Zhongshan) Company, Ltd. v. United States*, 38 CIT __, 971 F. Supp. 2d 1333 (2014), Commerce substituted for Layo Wood

the next largest exporter by volume, Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.

("Senmao"), as the second mandatory respondent.

Commerce published the preliminary results of the second review (the "Preliminary

Results") on January 9, 2015.  *Prelim. Results*, 80 Fed. Reg. at 1,388.  Commerce incorporated

by reference a "Decision Memorandum for Preliminary Results."  *Id.* at 1,388 n.1; *see Decision*

*Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Multilayered*

*Wood Flooring from the People's Republic of China* (Int'l Trade Admin. Dec. 31, 2014) (P.R.

Doc. 343), *available at* https://enforcement.trade.gov/frn/summary/prc/2015-00197-1.pdf (last

visited June 5, 2018) ("*Prelim. I&D Mem.*").  For the Preliminary Results, Commerce calculated

weighted-average dumping margins of zero for Dalian Dajen and 18.27% for Senmao.  *Prelim.*

*Results*, 80 Fed. Reg. at 1,389.  Commerce preliminarily assigned the 18.27% rate calculated for

Senmao to the "separate-rate" respondents, i.e., those exporter/producers of the subject

merchandise whom Commerce was not examining individually but who could establish

independence from the control of the PRC government.  *See id.*  Under the Department's

practice, the separate-rate respondents would qualify for a rate different than the rate Commerce

would assign to exporters/producers who had failed to establish independence from government

control.

In the Final Results, published on July 15, 2015, Commerce assigned weighted-average

dumping margins of zero to Dalian Dajen and 13.74% to Senmao.  *Final Results*, 80 Fed. Reg.

at 41,478.  Commerce assigned the 13.74% rate calculated for Senmao to the separate-rate

respondents.  *Id.*

C.  The Parties to this Consolidated Action

Eight cases contesting the Final Results, commenced between July 28, 2015 and

August 14, 2015, were consolidated by order dated January 15, 2016.[2]  Order (Jan. 15, 2016),

ECF No. 56.

The following parties and groups of parties are plaintiffs in this consolidated action:

(1) the Coalition, an association of U.S. producers of multilayered wood flooring and a

participant in the second review; (2) Dunhua City Jisen Wood Industry Co., Ltd. ("Jisen Wood")

and Yingyi-Nature (Kunshan) Wood Industry Co., Ltd. ("Yingyi-Nature"), two separate-rate

respondents; (3) Old Master Products, Inc. ("Old Master"), a U.S. importer of subject

merchandise; (4) Armstrong Wood Products (Kunshan) Co., Ltd., a producer and exporter of

subject merchandise (that was previously imported by Armstrong World Industries, Inc.), and

Armstrong Flooring, Inc. (together, "Armstrong"), the successor-in-interest to Armstrong World

Industries, Inc.;[3] (5) the "Penghong Plaintiffs," a group that includes separate-rate respondents

and importers of subject merchandise;[4] (6) Fine Furniture (Shanghai) Limited ("Fine Furniture"),

---

[2] Under Consolidated Court No. 15-00225 are the following eight cases:  *Dunhua City Jisen Wood Industry Co. v. United States*, Court No. 15-00204; *Fine Furniture (Shanghai) Ltd. v. United States*, Court No. 15-00210; *Jiangsu Senmao Bamboo and Wood Industry Co. v. United States*, Court No. 15-00225; *Old Master Products, Inc. v. United States*, Court No. 15-00230; *Armstrong Wood Products (Kunshan) Co. v. United States*, Court No. 15-00234; *Dalian Penghong Floor Products Co. v. United States*, Court No. 15-00236; *Lumber Liquidators Services, LLC v. United States*, Court No. 15-00237; and *Coalition for American Hardwood Parity v. United States*, Court No. 15-00238.

[3] Armstrong Flooring, Inc. was substituted as a plaintiff for Armstrong World Industries, Inc. by court order on May 16, 2016.  *See* Order (May 16, 2016), ECF No. 87; *see also* Mot. for Substitution of Armstrong Flooring, Inc. for Armstrong World Industries, Inc. as a Consol. Pl. (Apr. 15, 2016), ECF No. 80.

[4] The "Penghong Plaintiffs" are BR Custom Surface, CDC Distributors, Inc., CLBY Inc. *doing business as* D&M Flooring, Custom Wholesale Floors, Inc., Dalian Penghong Floor (continued . . .)

a separate-rate respondent;[5] (7) Lumber Liquidators Services, LLC ("Lumber Liquidators"), a

U.S. importer of subject merchandise; and (8) the "Senmao Plaintiffs," which include the

mandatory respondent Senmao and various separate-rate respondents.[6]  Guangdong Yihua

---

(. . . continued)
Products Co., Ltd., Doma Source LLC, Dunhua City Hongyuan Wooden Products Co., Ltd.,
Galleher Corporation, HaiLin LinJing Wooden Products, Ltd., Hangzhou Hanje Tec Co., Ltd.,
Hangzhou Zhengtian Industrial Co., Ltd., Huzhou Chenghang Wood Co., Ltd., Huzhou
Fulinmen Imp. & Exp. Co., Ltd., Metropolitan Hardwood Floors, Inc., Mudanjiang Bosen Wood
Industry Co., Ltd., Nakahiro Jyou Sei Furniture (Dalian) Co., Ltd., Pinnacle Interior Elements,
Ltd., Real Wood Floors, LLC, Shanghai Eswell Timber Co., Ltd., Shanghai Shenlin Corporation,
Shenyang Haobainian Wooden Co., Ltd., Shenzhenshi Huanwei Woods Co., Ltd., Swiff Train
Co., Timeless Design Import LCC, V.A.L. Floors, Inc., Wego Chemical & Mineral Corp.,
Xuzhou Shenghe Wood Co., Ltd., Zhejiang Dadongwu Greenhome Wood Co., Ltd., Zhejiang
Fuma Warm Technology Co., Ltd., Zhejiang Longsen Lumbering Co., Ltd., and Zhejiang
Tianzhen Bamboo & Wood Development Co., Ltd.

    [5] Fine Furniture (Shanghai) Limited ("Fine Furniture") and Yingyi-Nature (Kinshan)
Wood Industry Co., Ltd. ("Yingyi-Nature") withdrew from the complaint filed *in Jiangsu
Senmao Bamboo and Wood Industry Co. v. United States*, Court No. 15-00225, *see* Order
(Aug. 14, 2015), ECF No. 14, because counsel erroneously included Fine Furniture and
Yingyi-Nature in that complaint despite the fact that the two separate-rate respondents "had filed
separate complaints for this Commerce Department review through other counsel."  Consent
Mot. to Withdraw Compl. of Two Pls. 2 (Aug. 13, 2015), ECF No. 11.  Despite their withdrawal
as plaintiffs from *Jiangsu Senmao Bamboo and Wood Industry Co. v. United States*, Court
No. 15-00225 (in which Fine Furniture later intervened as a plaintiff-intervenor, *see* Order
(Aug. 26, 2015), ECF No. 25), Fine Furniture remains a plaintiff in *Fine Furniture (Shanghai)
Limited v. United States*, Court No. 15-00210 and Yingyi-Nature remains a plaintiff in *Dunhua
City Jisen Wood Industry Co. v. United States*, Court No. 15-00204.

    [6] The "Senmao Plaintiffs" are Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.
("Senmao"), Baishan Huafeng Wooden Product Co., Ltd., Changbai Mountain Development and
Protection Zone Hongtu Wood Industrial Co., Ltd., Chinafloors Timber (China) Co., Ltd., Dalian
Kemian Wood Industry Co., Ltd., Dalian Qianqiu Wooden Product Co., Ltd., Dasso Industrial
Group Co., Ltd., Dongtai Fuan Universal Dynamics, LLC., Dun Hua Sen Tai Wood Co., Ltd.,
Dunhua City Wanrong Wood Industry Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd.,
Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd.,
Guangzhou Panyu Kangda Board Co., Ltd., Hunchun Forest Wolf Wooden Industry Co., Ltd.,
Jiafeng Wood (Suzhou) Co., Ltd., Jiangsu Guyu International Trading Co., Ltd., Jiangsu Kentier
Wood Co., Ltd., Jiangsu Mingle Flooring Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Jiashan
HuiJiaLe Decoration Material Co., Ltd., Jilin Forest Industry Jinqiao Flooring Group Co., Ltd.,
Kemian Wood Industry (Kunshan) Co., Ltd., Nanjing Minglin Wooden Industry Co., Ltd., Puli
(continued . . .)

Timber Industry Co., Ltd. ("Yihua"), a separate-rate respondent, is a plaintiff-intervenor in this

consolidated action.  Before the court are motions for judgment on the agency record filed by

these plaintiffs and Yihua, which are opposed by defendant United States.

## II.  DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c), under which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended*, 19 U.S.C. § 1516a,

including an action contesting a final determination concluding an administrative review of an

antidumping duty order.  *See* 19 U.S.C. § 1516a(a)(2)(B)(iii).[7]  In reviewing a final

determination, the court "shall hold unlawful any determination, finding, or conclusion found . . .

to be unsupported by substantial evidence on the record, or otherwise not in accordance with

law."  *Id.* § 1516a(b)(1)(B)(i).

### B.  Periodic Review of an Antidumping Duty Order on Merchandise Imported from a Nonmarket Economy Country

When Commerce conducts, upon a request or requests, a periodic review of an

antidumping duty order, Commerce is directed by the statute to "review and determine . . . the

amount of any antidumping duty," 19 U.S.C. § 1675(a)(1)(B), and in doing so is directed to

determine "the normal value and export price (or constructed export price) of each entry of the

_____

(. . . continued)

Trading Limited, Shanghai Lizhong Wood Products Co., Ltd./The Lizhong Wood Industry Limited Company of Shanghai/Linyi Youyou Wood Co., Ltd., Suzhou Dongda Wood Co., Ltd., Tongxiang Jisheng Import And Export Co., Ltd., Zhejiang Fudeli Timber Industry Co., Ltd., and Zhejiang Shiyou Timber Co., Ltd.

[7] Unless otherwise noted, all citations to the United States Code herein are to the 2012 edition.  All citations to the Code of Federal Regulations herein are to the 2015 edition.

subject merchandise, and . . . the dumping margin for each such entry." *Id.* § 1675(a)(2)(A).  A

"dumping margin" is "the amount by which the normal value exceeds the export price[8] or

constructed export price[9] of the subject merchandise." *Id.* § 1677(35)(A).

Under the antidumping duty statute, the normal value of subject merchandise typically

will be determined based on prices in sales in the exporting country (the "home market") of a

product that is "like" the subject merchandise (the "foreign like product," *see* 19 U.S.C.

§ 1677(16)).  19 U.S.C. § 1677b(a)(1).  When the exporting country is a nonmarket economy

("NME") country, Commerce, as provided in section 773(c) of the Tariff Act, 19 U.S.C.

§ 1677b(c), as a general matter determines the normal value of subject merchandise "on the basis

of the value of the factors of production utilized in producing the merchandise" with additions

for "general expenses and profit plus the cost of containers, coverings, and other expenses."[10]

19 U.S.C. § 1677b(c)(1).  Among the "factors of production" are "(A) hours of labor required,

(B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed,

and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).  The

---

[8] "Export price" is determined from "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," to which are made certain adjustments.  19 U.S.C. § 1677a(a).

[9] "Constructed export price" is determined from "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," to which are made certain adjustments.  19 U.S.C. § 1677a(b).

[10] The International Trade Administration, U.S. Department of Commerce, considers China to be a "nonmarket economy [('NME')] country," a term defined in 19 U.S.C. § 1677(18)(A) as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."

statute provides that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1). The statute further provides that Commerce, "in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country, and . . . significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). In the second review, Commerce chose Thailand as the single "surrogate" country for purposes of § 1677b(c). *See Final I&D Mem.* at 41.

C. Issues Presented for Judicial Review

Certain claims in this consolidated case, made by various plaintiffs, pertain to the Department's method of determining the normal value of the subject merchandise produced by Senmao under the nonmarket economy country procedures of 19 U.S.C. § 1677b(c). The Coalition challenges the Department's surrogate value for Senmao's plywood input, and Senmao, Yingyi-Nature, and Jisen Wood, joined by Yihua and several other plaintiffs who were respondents in the second review, challenge the Department's surrogate value for "overlaying" glue and challenge the method by which Commerce calculated a surrogate cost for foreign inland freight. All plaintiffs, and Yihua, who were respondents in the second review challenge the Department's choice of record information for use in calculating categories of surrogate expenses (factory overhead and selling, general, and administrative ("SG&A") expenses) and surrogate profit.[11]

---

[11] Lumber Liquidators Services, LLC ("Lumber Liquidators"), an importer of subject merchandise, made only this claim in its motion for judgment on the agency record. *See* (continued . . .)

Fine Furniture claims that the Department's refusal to accept Fine Furniture as a voluntary respondent was not in accordance with the law and was an abuse of discretion.

Yingyi-Nature, Jisen Wood, and Armstrong, joined by Fine Furniture, Old Master, the Penghong Plaintiffs, and Yihua, claim that Commerce, in determining the export price for Senmao's subject merchandise, made an unlawful deduction from the price upon which export price is determined (the "starting price") to account for irrecoverable value-added tax ("VAT") imposed by the PRC.

Old Master claims that Commerce acted unlawfully in assigning to the separate-rate respondents the rate of 13.74%, arguing that this rate, being based entirely on the individual margin Commerce determined for one respondent, i.e., Senmao, is not a representative sample and not reflective of commercial reality.

The Penghong Plaintiffs claim that the Department impermissibly allowed the Coalition to amend its request for an administrative review of, and thereby obtain an administrative review of, Shenyang Haobainian Wooden Co., Ltd. after the expiration of the applicable due date for such requests.  The court addresses the various claims below.[12]

### D.  Claims Challenging the Department's Surrogate Values for Raw Materials

### 1.  The Coalition's Claim Challenging the Department's Surrogate Value for Plywood

The Coalition claims that the surrogate value Commerce applied for plywood, one of the raw materials Senmao used in producing the subject merchandise, was not based on the best

---

(. . . continued)
Pl.-Intervenor Lumber Liquidators Services, LLC Rule 56.2 Mem. in Supp. of Mot. for J. upon the Agency R. 2-8 (Mar. 22, 2016), ECF No. 67.

[12] The court does not consider certain claims that were included in complaints filed in this consolidated case because these claims were not raised in the briefing required by USCIT Rule 56.2 and therefore have been waived.

available information on the record and therefore was unlawful.  Pl.'s Rule 56.2 Mem. in Supp.

for J. upon the Agency R. 7 (Mar. 15, 2016), ECF No. 61-1 ("Coalition's Br.").  Because

Commerce did not address in its Final Issues and Decision Memorandum a particular argument

the Coalition made in the brief it filed during the review, the court remands the surrogate value

determination to Commerce for reconsideration of this issue.

For the Final Results, Commerce used import value data obtained from the Global Trade

Atlas ("GTA") pertaining to plywood imports in Thailand (Thai Harmonized Tariff Schedule

("Thai HTS") subheading 4412.32.00-000) to value Senmao's plywood input.  *Final I&D Mem.*

at 41.  Commerce calculated an average unit value ("AUV") for Thai imports from all countries

other than those Commerce inferred to have benefited from export subsidies (India, Indonesia,

South Korea and Thailand) and nonmarket economy countries (e.g., China and Vietnam).  *See*

*Prelim. I&D Mem.* at 20.  The six remaining source countries in the Thai import data were

Finland, Germany, Malaysia, Russia, Taiwan, and the United States (with Germany representing

a negligible quantity).  The resulting AUV was the surrogate value Commerce applied to the

plywood input, which was $96.53 per cubic meter.  *Final I&D Mem.* at 42.

The Coalition does not contest the Department's decision to use import data from

Thailand, rather than data from another possible surrogate country, in determining the plywood

surrogate value.  Nor does the Coalition contest the decision to exclude the data from certain

countries based on subsidization or status as a nonmarket economy country.  The Coalition

confines its claim to how Commerce used the GTA Thai import data, arguing that Commerce

erred by not excluding from the AUV calculation the data on imports into Thailand from Taiwan

and the United States, the data for each of which the Coalition characterizes as having an

aberrationally low AUV.  Coalition's Br. 8.  The AUVs for the imports from Taiwan and the

United States were $13 per cubic meter and $23 per cubic meter, respectively. *See Coalition for American Hardwood Parity's Case Br.* at Ex. 6 (Feb. 10, 2015) (P.R. Doc. 392) ("*Coalition's Case Br.*"). The Coalition submits that an AUV of $370 per cubic meter would have resulted were the imports from Taiwan and the United States excluded from the surrogate value calculation. Coalition's Br. 9.

The Coalition argues that the Thai AUV for plywood imports from Taiwan on a per-kilogram basis is less than the Thai AUVs for imports of wood chips or particles and for other sawdust, wood waste, and scrap. *See* Coalition's Br. 9; *see also Coalition's Case Br.* 14. The Coalition argues, essentially, that wood chips or particles and other sawdust, wood waste, and scrap should be valued less than plywood, such that the Thai AUV for plywood imports from Taiwan must be aberrationally low. The Coalition asserts that the Thai AUV "for non-coniferous wood scrap in the form of chips or particles" is $0.0243 per kilogram and that the Thai AUV "for other sawdust, wood waste, and scrap" is $0.0805 per kg, while the Thai AUV for plywood from Taiwan, on a per-kilogram basis, is $0.0204 per kg. Coalition's Br. 9. The Coalition calculated this latter figure by converting the AUV for Taiwan of $13 per cubic meter to kilograms by applying a density factor of 638.96 kg/cubic meter.[13] *See Coalition's Case Br.* at Ex. 1, Ex. 8.

Because the Coalition made its argument regarding chips, sawdust, waste, and scrap in its case brief filed before Commerce, *see Coalition's Case Br.* at 14, and because the data supporting this argument potentially would detract from the Department's finding that the Thai

---

[13] The Coalition calculated the 638.96 kg/cubic meters factor by averaging the density of four types of plywood placed on the record by Fine Furniture. *See Coalition for American Hardwood Parity's Case Br.* at Ex. 1 (Feb. 10, 2015) (P.R. Doc. 392); *see also Administrative Review of the Antidumping Duty Order on Multilayered Wood Flooring from the People's Republic of China: Surrogate Value Comments* at Ex. SV-3 (Oct. 31, 2014) (P.R. Docs. 307-12).

AUV of plywood imports from Taiwan was not aberrationally low, Commerce was obligated to

address this argument in its final determination.  *See SKF USA Inc. v. United States*,

630 F.3d 1365, 1374 (Fed. Cir. 2011) ("Commerce also has an 'obligation' to address important

factors raised by comments from petitioners and respondents." (citations omitted)).  Commerce

did not do so.  *See Final I&D Mem.* at 41-43.  The court, therefore, directs Commerce to

reconsider its surrogate value for plywood in light of this argument.  In doing so, the court

expresses no view on whether the data the Coalition cites necessarily require Commerce to find

that the Thai AUVs of plywood imports from Taiwan or the United States are aberrationally low.

At this time, the court will not rule on the other arguments the Coalition presented in contesting

the plywood surrogate value.

    2.  Claims Challenging the Department's Surrogate Value for "Overlaying" Glue

Senmao reported using two types of glue in producing subject merchandise, "overlaying"

glue and "fixing" glue.  *Final I&D Mem.* at 47.  At issue in this litigation is the surrogate value

for overlaying glue, which Senmao used "to adhere the face veneer and plywood."  *Id.*

Commerce valued Senmao's overlaying glue input using AUVs obtained from Thai GTA import

data pertaining to a subheading under Thai HTS heading 3506.  *Id.* at 48.

Senmao, Yingyi-Nature, and Jisen Wood claim that Commerce erred in concluding that

Thai HTS heading 3506 includes within its scope Senmao's overlaying glue.  They claim that the

correct classification for this overlaying glue is under Thai HTS heading 3909 and, therefore,

that Commerce should have used instead the GTA data for a subheading under this heading to

value the overlaying glue.  Mem. of Law in Supp. of Senmao Pls.' Mot. for J. on the Agency R.

under USCIT Rule 56.2 34-38 (Mar. 15, 2016), ECF No. 63 ("Senmao's Br."); Pls. Dunhua City

Jisen Wood Industry Co., Ltd. and Yingyi-Nature (Kunshan) Wood Industry Co., Ltd. Mem. in

Supp. of Mot. for J. on the Agency R. 6-7 (Mar. 22, 2016), ECF No. 69-2 ("Jisen Wood's Br.").

The two headings at issue are internationally harmonized, i.e., the relative scope of each

is determined according to the tariff classification rules and principles of the international

Harmonized Commodity Description and Coding System ("Harmonized System" or "HS").

Because Thailand (like the United States and, essentially, all of its trading partners) is a member

of the Harmonized System Convention, the Thai HTS is structured according to the

nomenclature of the HS to the six-digit level.  Classification of all goods under the Harmonized

System is governed by the "General Rules for the Interpretation of the Harmonized System,"

(also identified as the "General Interpretive Rules" or "GIRs"), which, like the HS nomenclature,

are effectuated in the tariff laws of all member countries of the Harmonized System Convention.

*See* Explanatory Notes to the Harmonized Commodity Description and Coding System, 5th ed.

(2012) ("ENs") (setting forth and explaining the proper application of the GIRs to the HS

nomenclature).[14]  GIR 1 provides that "for legal purposes, classification shall be determined

according to the terms of the headings and any relative Section or Chapter Notes and, provided

such headings or Notes do not otherwise require, according to the following provisions," i.e.,

GIRs 2 through 6.

Adjudicating Senmao's and Yingyi-Nature and Jisen Wood's claims requires the court to

consider whether the Department's finding that the GTA data for Thai HTS heading 3506 were

the "best available information," 19 U.S.C. § 1677b(c)(1), is supported by substantial evidence.

For the reasons discussed below, the court concludes that it was not.  The record does not contain

---

[14] All citations to the World Customs Organization's Harmonized Commodity
Description and Coding System ("HS") Explanatory Notes ("ENs") contained herein are to the
2012 edition with the 2015 supplements.

evidence to support a determination that the overlaying glue is properly classified under Thai

HTS heading 3506.

The terms of HS heading 35.06 (and, therefore, the terms of Thai HTS heading 3506 as

well) are as follows: "Prepared glues and other prepared adhesives, not elsewhere specified or

included; products suitable for use as glues or adhesives, put up for retail sale as glues or

adhesives, not exceeding a net weight of 1 kg."  EN 35.06.  The terms of HS heading 39.09 (and

Thai HTS heading 3909) are: "Amino-resins, phenolic resins and polyurethanes, in primary

forms."  EN 39.09.

There is evidence on the record, in a questionnaire response submitted by Senmao,

indicating that the overlaying glue, as would be expected for an adhesive used in manufacturing,

was not put up for retail sale in containers of 1 kg. or less.  *See Multilayered Wood Flooring*

*from the People's Republic of China: Supplemental Section A, C &D Response* 8

(Sept. 29, 2014) (P.R. Doc. 295) ("*Senmao's Supp. QR*") (describing the overlaying glue as a

glue "only used for industrial purposes").  The questionnaire response also states that the

overlaying glue, as purchased by Senmao, is a finished glue rather than a powder resin that is

processed into finished glue.  *Id.* at 9.  Accordingly, by application of GIR 1, the glue could be

classified under Thai HTS 3506 only if it is "not elsewhere specified or included," i.e., not

included in another heading of the nomenclature.  The record lacks evidence to support a

conclusion that the overlaying glue is not included within the scope of another heading of the

Thai HTS.

Some finished glues are in the form of liquids and pastes ("primary forms") and are

classified within HS Chapter 39 ("Plastics and articles thereof"):

> In addition to substances necessary for "curing" (such as hardeners (cross-linking
> agents) or other co-reactants and accelerators), these liquids or pastes may contain

> other materials such as plasticizers, stabilisers, fillers and colouring matter,
> chiefly intended to give the finished products special physical properties or other
> desirable characteristics.  The liquids and pastes are used for casting, extrusion,
> etc., and also as impregnating materials, surface coatings, bases for varnishes and
> paints, or *as glues*, thickeners, flocculants, etc.

EN to Chapter 39 (emphasis added).

Within Chapter 39, Heading 39.09 ("Amino-resins, phenolic resins and polyurethanes, in

primary forms") contains a six-digit, internationally-harmonized subheading, 3909.10 ("Urea

resins; thiourea resins").  In its surrogate value comments, Senmao identified Thai HTS

subheading 3909.10 as the correct six-digit subheading for its overlaying glue (specifically

identifying as the correct classification the country-specific subheading of HTS 3909.10.90-000).

*See Multilayered Wood Flooring from the People's Republic of China: Surrogate Value*

*Comments* at Ex. 1 (Aug. 11, 2014) (P.R. Doc. 266-67) ("*Senmao's SV Comments*").  HS

Subheading 3909.10 is one of three six-digit subheadings within HS heading 39.09 that pertain to

the amino-resins classifiable under the heading (the others being HS subheading 3909.20

("Melamine resins") and HS subheading 3909.30 ("Other amino-resins")).  The Explanatory

Note for heading 39.09 provides that:

> These resins are used for the manufacture of transparent, translucent or brightly
> coloured articles of plastics and are much used for moulding table and fancy ware
> and electrical goods.  In solutions and dispersions (emulsions and suspensions),
> (whether or not modified with oils, fatty acids, alcohols, or other synthetic
> polymers) *they are employed as glues* and as textile dressings, etc.  (See the
> General Explanatory Note to this Chapter [39], exclusion (b), for the classification
> of glues.).

EN 39.09 (emphasis added).  "Exclusion (b)" in the General Explanatory Note to Chapter 39

provides the critical distinction between the resin-based glues of HS heading 35.06 and those of

heading 39.09.  It instructs that the following glues are excluded from Chapter 39:

> Preparations specially formulated for use as adhesives, consisting of polymers or
> blends thereof of headings 39.01 to 39.13 which, apart from any permitted

additions to the products of this Chapter (fillers, plasticisers, solvents, pigments, etc.) contain other added substances not falling in this Chapter (e.g., waxes, rosin esters, unmodified natural shellac) . . . (**heading 35.06**).

EN Chapter 39, exclusion (b).  There is evidence of record that the overlaying glue does *not* contain added substances other than those considered permitted additions by the language of exclusion (b), which identifies as including fillers, plasticizers, solvents, and pigments, but this evidence is limited to Senmao's surrogate value comments, which identified Thai HTS subheading 3909.10 as the correct six-digit subheading for its overlaying glue.  *See Senmao's SV Comments* at Ex. 1.  On the other hand, the record contains no evidence that the overlaying glue *does* contain any substance that would result in its classification outside of the scope of HS heading 39.09 and, therefore, within the scope of HS heading 35.06, which as to bulk liquids and pastes is limited to prepared glues "not elsewhere specified or included."  *See* EN 35.06.  Despite this complete lack of record evidence, Commerce determined Thai HTS heading 3506 to be the correct tariff classification for Senmao's overlaying glue.  It did so without even making a finding of fact that the overlaying glue contained a specific substance removing it from the scope of Thai HTS heading 3909.  Nor did Commerce conduct a proper analysis of the tariff classification issue presented to it.  Instead, Commerce based its determination that the Thai GTA import data for a subheading of heading 3506 (specifically, Thai HTS subheading 3506.91.90-000[15]) was the best available information on a series of findings—all of which are irrelevant to the issue of which heading is the correct one—and erroneous conclusions that violate established principles of tariff classification under the HS.

---

[15] Senmao submits that Commerce erroneously identified Thai HTS subheading 3506.91.00-000 as subheading "3506.91.90-000," which Senmao alleges does not exist.  *See* Mem. of Law in Supp. of Senmao Pls.' Mot. for J. on the Agency R. under USCIT Rule 56.2 34 n.1 (Mar. 15, 2016), ECF No. 63 ("Senmao's Br.").

Commerce began its analysis by reciting its familiar criteria for selecting surrogate

values. *Final I&D Mem.* at 47 ("[T]he Department's preference is to use, where possible, a

range of publicly available, non-export, tax-exclusive, and product-specific prices for the

POR . . . ."). It then compared the two competing tariff classifications based on these four

criteria, stating that "[r]egarding HTS subheading 3909.10.90-000 and 3506.91.90-000, we find

that both represent a broad market average, are publicly available, are exclusive of taxes and

duties and are contemporaneous with the POR. However, based on the record before us, we do

not find the HTS classifications to be equally specific to the overlaying glue input reported by

Senmao." *Id.* This was error. Because the GTA data are generated according to the

international HS nomenclature and the GIRs, which form the basis of Thailand's tariff

classification scheme, a surrogate value determined according to a set of Thai import data can be

valid and reliable only if the data set is selected according to the established HS tariff

classification principles. Commerce itself seems to acknowledge this much, citing and relying in

part on a legal note within the international "harmonized commodity description and coding

system." *Id.* In deciding which set of GTA data was the best available information, Commerce

first needed to determine which of the competing Thai HTS headings, 3506 or 3909, was correct

for the overlaying glue. Commerce overlooked this issue, addressing instead the question of

which of two subheadings, each of which was under a different heading, was more specific.

"Relative specificity" is the criterion applied by GIR 3(a), not GIR 1, and it is a fundamental

principle of tariff classification under the HS (if not the most fundamental principle) that resort

to GIR 3 may not be had unless the correct heading cannot be determined according to GIRs 1

and 2. GIR 3 applies only "[w]hen by application of Rule 2(b) or for any other reason, goods are

*prima facie*, classifiable under two or more headings." GIR 3. Here, it is error to choose

between the two headings based on relative specificity because the terms of both cannot, even

*prima facie*, describe the overlaying glue.  By the terms of HS heading 35.06, the two headings

are mutually exclusive.  *See* HS heading 35.06 ("Prepared glues and other prepared adhesives,

*not elsewhere specified or included . . .*" (emphasis added)).  In short, Commerce erred in

choosing Thai HTS 3506 over Thai HTS 3909 without regarding the principle of GIR 1, and it

also erred in deciding upon a subheading (which it based on the impermissible criterion of

relative specificity) before deciding upon a heading, in violation of the GIRs in general and GIRs

1 and 6 in particular.

Commerce further erred in rejecting Thai HTS heading 3909 based in part on HS Note 6

to Chapter 39 as it relates to the term "in primary forms" as used in Thai HTS heading 3909 and

certain subheadings thereunder.  *See Final I&D Mem.* at 47-48.  As Commerce noted, "Legal

Note 6 of Chapter 39 of the harmonized commodity description and coding system provides that

'primary forms' includes liquids, pastes, and powders."  *Id.* at 47.  The record evidence (i.e.,

Senmao's response to the supplemental questionnaire) shows that the overlaying glue is not a

powder, but it does not show that it is not a liquid or paste, and, as a practical matter, it is hard to

imagine that it could function as overlaying glue if it were anything but a liquid or paste.  *See*

*Senmao's Supp. QR* at 9.  Finding as a fact that "[t]o the extent that Senmao's purchased

'finished' glue undergoes any further processing, it is minimal at best," Commerce concludes

that this finding "weighs against finding that the overlaying glue reported by Senmao was in a

'primary form.'"[16]  *Final I&D Mem.* at 48.  This conclusion is misguided.  The finding that

---

[16] Commerce noted that Senmao "separately reported flour as an 'additive to mix the overlaying glue.'"  *Issues and Decision Mem. for the Final Results of 2012-2013 Antidumping Duty Administrative Review of Multilayered Wood Floor from the People's Republic of China* 48 (Int'l Trade Admin. July 8, 2015) (P.R. Doc. 418), *available at* (continued . . .)

Senmao's overlaying glue did not undergo significant processing after it was purchased in no

way supports a conclusion that this glue is excluded from the scope of Thai HTS heading 3909.

As Note 6 to Chapter 39 of the HS and the ENs make clear, a finished glue can be in a "primary

form" as a liquid or paste, and some finished glues are liquids or pastes that are correctly

classified under HS heading 39.09.  Similarly misguided is the Department's conclusion that

"Senmao expressly stated that it did not use powder resin in producing subject merchandise,

which is a subset of the products covered under HTS 3909.10.90-000" and "[a]s such,

HTS 3909.10.90-000 includes a product that Senmao expressly disclaims using (powder resin),

detracting from its specificity to Senmao's input."  *Id.*  The record evidence that Senmao did not

use a powder resin does not support a finding or conclusion that Senmao's asserted classification

was incorrect.

        In summary, there was no record evidence to support a valid finding that the overlaying

glue is excluded from the scope of Thai HTS heading 3909.  As discussed above, Thai HTS

heading 3506 could be correct only if the overlaying glue *is* excluded from heading 3909.  There

was some evidence that Thai HTS heading 3909 is the correct heading, albeit limited to

Senmao's assertion to that effect.  The finding that the Thai GTA data for a subheading of Thai

HTS heading 3506 were better "available information" than the data for a subheading of Thai

HTS heading 3909 is, therefore, entirely unsupported by record evidence.

        Senmao argues that Commerce acted contrary to law when, at the urging of the petitioner,

it rejected Senmao's case brief on the ground that the portions of the brief referencing the HS

Explanatory Notes constituted an untimely submission of new factual information.  Senmao's

---

                                                                           (. . . continued)
https://enforcement.trade.gov/frn/summary/prc/2015-17368-1.pdf (last visited June 5, 2018)
("*Final I&D Mem.*").

Br. 37; *see Rejection of Submission of Case Brief Filed in the 2012-2013 Administrative Review of the Antidumping Duty Order on Multilayered Wood Flooring from the People's Republic of China* (Feb. 12, 2015) (P.R. Doc. 396) ("*Dep't's Letter*").   Senmao refiled its brief after deleting the references Commerce rejected.   Before the court, Senmao again relies upon the ENs in support of its claim.   *See* Senmao's Br. 36-37.   Defendant argues that the Department's decision to reject Senmao's initial case brief was proper and, further, that because the ENs constitute information that is not on the record, the court may not consider them in addressing Senmao's claim.   *See* Def.'s Resp. to Mots. for J. upon the Admin. R. 24 (July 14, 2016), ECF No. 90 ("Def.'s Br.").   According to defendant, because this is not a "customs classification case," the court's review of the Department's determination is "limited to the record developed before Commerce."   *See id.*

Commerce was wrong to reject the case brief with the EN references, and defendant is wrong in arguing that the court should not consider the ENs in adjudicating the claim.   The Department's regulation, 19 C.F.R. § 351.102(b)(21), defines "factual information" to include several categories of "evidence" and also to include "[p]ublicly available information submitted to value factors under § 351.408(c)," i.e., factors of production in a nonmarket economy proceeding.   The ENs are not evidence.   Rather than factual information that might be considered "evidence," they are an international legal reference essential to the proper interpretation of the HS nomenclature and GIRs.   *See, e.g.*, *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (explaining that the ENs are "generally indicative of the proper interpretation of a tariff provision").   Nor are the ENs information described by 19 C.F.R. § 351.102(b)(21)(iii) ("Publicly available information submitted to value factors under § 351.408(c) . . .").   The information to which § 351.408(c)(iii) refers is properly interpreted, consistent with the statutory

provision it is effectuating, as "information regarding the values of . . . factors [of production] in

a market economy country or countries," 19 U.S.C. § 1677b(c)(1), and "prices or costs of factors

of production," *id.* § 1677b(c)(4).  The ENs cannot serve as "information" to "value" anything,

are not information on "prices" or "costs," and, moreover, emanate from an international body,

the World Customs Organization (the "WCO"), not from any particular country or countries.

Here, the pertinent information Senmao submitted, and Commerce considered, for valuation of

the overlaying glue factor of production was the Thai GTA information.  As a legal reference on

the interpretation of the GIRs and the HS nomenclature, including the scope of headings and

six-digit subheadings, the WCO's Explanatory Notes are in this context essentially no different

than any other legal reference a party may cite in a case brief before Commerce or argue before a

court, such as a statute, judicial precedent, or restatement of the law.  For these reasons, the court

concludes that Commerce misapplied its regulation in rejecting Senmao's case brief and that

defendant is misguided in arguing that the court may not consider the ENs as a legal reference in

adjudicating this claim.

Senmao argues that the record citations to the ENs that Commerce refused to consider

"would have resolved the issue."  Senmao's Br. 35.  If by this Senmao is arguing that the ENs,

when applied to the record information about the overlaying glue, resolve the question of the

proper tariff heading, the court disagrees.  As the court discussed previously, the fact needed to

determine whether Thai HTS heading 3506 or Thai HTS heading 3909 is the correct heading is

the composition of the glue that includes, in particular, the identity of the added ingredients.  By

submitting Thai HTS subheading 3909.10.90-000 as the correct tariff classification, Senmao has

disclosed publicly that the finished glue is based on a urea resin or thiourea resin.  Senmao

included in its questionnaire response a more specific chemical identity for the main component

of the finished glue (for which it claimed confidential treatment), but it did not disclose the

identity of any other component of the finished glue (nor did Commerce request that it do so).[17]

In conclusion, the Department's determination that GTA data for a subheading under

Thai heading 3506 is the best available record information with which to value the overlaying

glue input is not supported by substantial evidence.  The court, therefore, must remand this

determination for reconsideration.

Nothing on the record refutes Senmao's assertion in its surrogate value submission that

its overlaying glue is properly classified under Thai HTS heading 3909.  On the record as it now

stands, Commerce on remand must accept that assertion because the opposite assertion—that

heading 3506, which applies only to bulk finished adhesives that are "not elsewhere specified or

included," is the correct heading—is entirely unsupported by record evidence.  In the alternative,

Commerce has the discretion to reopen the record in an effort to reach a new determination,

supported by valid factual findings, of which of the two tariff headings is correct.  If using GTA

import data to value this input, it must determine the correct tariff heading before it may proceed

to select the proper subheading.  *See* GIRs 1, 6 (the correct subheading is to be determined

according to terms of the subheadings and related subheading legal notes and according to

GIRs 1-5 applied *mutatis mutandis* at the subheading level, only after the correct heading has

been determined).

---

[17] Had Commerce consulted the Explanatory Notes to ascertain the intended scope of the competing headings, it likely would have requested in the supplemental questionnaire the information needed to resolve the question of which heading was proper for the overlaying glue. It is unrealistic for Commerce to expect that it invariably will be able to determine the correct GTA import data for valuing a production input without consulting the ENs, which are an essential reference for resolution of tariff classification questions at the internationally-harmonized four- and six-digit levels of the HS nomenclature.

E.  Claims Challenging the Department's Choice of Financial Statements for Valuing Factory
        Overhead Expenses, Selling, General and Administrative Expenses, and Profit

    In determining normal value in a proceeding involving goods from a nonmarket economy

country, Commerce typically calculates surrogate values for factory overhead expenses, for

selling, general & administrative expenses, and for profit, by calculating and applying "financial

ratios" derived from the financial statements of one or more producers of identical or comparable

merchandise in the primary surrogate country.  *See* 19 C.F.R. § 351.408(c)(4).  For these

purposes, Commerce used the financial statements of Eiwlee Industrial Co., Ltd. ("Eiwlee"), a

producer in Thailand of various wood products, including MLWF, finding that those financial

statements constituted the best available information on the record.  *See Final I&D Mem.* at 27.

    All plaintiffs except the Coalition challenge the Department's use of Eiwlee's financial

statements to calculate the surrogate financial ratios.  *See* Senmao's Br. 11-23; Mem. of P. & A.

in Supp. of Rule 56.2 Mot. for J. upon the Agency R. by Consol. Pl. Fine Furniture (Shanghai)

Ltd. 20-34 (Mar. 15, 2016), ECF No. 62-1 ("Fine Furniture's Br."); Pl.-Intervenor Lumber

Liquidators Services, LLC Rule 56.2 Mem. in Supp. of Mot. for J. upon the Agency

R. 2-8 (Mar. 22, 2016), ECF No. 67 ("Lumber Liquidators' Br."); Jisen Wood's Br. 3-4; Mem. in

Supp. of Rule 56.2 Mot. for J. upon the Agency R. by Consol. Pls. Armstrong Wood Products

(Kushan) Co., Ltd. and Armstrong World Industries, Inc. 4-6 (Mar. 22, 2016), ECF No. 68-1

("Armstrong's Br.") (summarizing arguments in support of its financial ratios claim and

incorporating the arguments of Senmao, Fine Furniture, and "other parties seeking reduction of

Senmao's rate"); *see also* Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. upon the Agency R.

by Consol. Pl. Old Master Products Inc. 5 (Mar. 22, 2016), ECF No. 70 ("Old Master's Br.")

(incorporating the arguments made by "other parties challenging," *inter alia*, the selection of the

surrogate financial ratios); Pl.-Intervenor Guangdong Yihua Timber Industry Co., Ltd.'s Rule

56.2 Mot. for J. on the Agency R. 2 (Mar. 22, 2016), ECF No. 71 ("Yihua's Br.") (incorporating

Senmao's and Fine Furniture's arguments); Mem. of P. & A. in Supp. of Consol. Pls.' 56.2 Mot.

for J. on the Agency R. 9 (Mar. 22, 2016), ECF No. 72-1 ("Penghong's Br.") (same).

   For the Preliminary Results, Commerce calculated the financial ratios using Eiwlee's

financial statements because it found that "Eiwlee is the only surrogate producer for which there

is record evidence showing that it is a producer of identical (*i.e.*, engineered wood flooring),

rather than comparable (*e.g.*, plywood, solid wood flooring, etc.) merchandise." *Prelim. I&D

Mem.* at 22 (footnote omitted).  Commerce chose Eiwlee's 2013 statements over Eiwlee's 2012

statements because "the 2013 statements . . . cover 11 months of the [December 1, 2012 through

November 30, 2013] POR, whereas the 2012 statements cover only the first month of the POR."

*Id.*; *see* Ex. 1 ("*Eiwlee's 2013 Financial Statements*") and Ex. 2 ("*Eiwlee's 2012 Financial

Statements*") to *Multilayered Wood Flooring from the People's Republic of China: Second

Administrative Review: Petitioners' Comments Prior to Preliminary Results and Submission of

Factual Information* (Nov. 3, 2014) (P.R. Docs. 314-315).

   For the Final Results, Commerce again chose to rely on Eiwlee's financial statements

over those on the record pertaining to any other producer in Thailand.  In doing so, it stated that

"it is the Department's preference to match the surrogate companies' production experience with

respondents' production experience, and whenever possible, surrogate country producers of

identical merchandise provided that the [surrogate value ("SV")] data is not distorted or

otherwise unreliable." *Final I&D Mem.* at 27 (footnote omitted).

   In a change from the Preliminary Results, Commerce used the 2012 Eiwlee statements

despite the reduced coverage of the POR, based on a finding that an auditor of Eiwlee's 2013

statements qualified her opinion as to the 2013 statements, having identified an insufficiency in

the information the company provided on Eiwlee's employee retirement benefit obligations for

the fiscal year ending on December 31, 2013.  *Id.* at 29.  Nevertheless, Commerce "relied on

certain 2012 figures reported in the 2013 statements in instances where the 2012 figures offer

greater detail when compared to the 2012 figures in the 2012 statements."[18]  *Id.*  Commerce

added that "[s]pecifically, we have used the detailed breakout of the 2012 cost of sales, which

includes material costs and overhead expenses, from the 2013 statements."  *Id.*

       The arguments made in support of the claims that Eiwlee's financial statements are not

the best available information on the record are that (1) Eiwlee's production process is less

similar to Senmao's production process than that of another company whose financial statement

is on the record and (2) there is evidence that Eiwlee's financial statements are affected by

Eiwlee's receipt of a countervailable subsidy.  Fine Furniture raises an additional objection to the

use of the 2013 Eiwlee financial statements based on the auditor's finding of an insufficiency in

the information the company provided on Eiwlee's employee retirement benefit obligations.  For

the reasons discussed below, the court concludes that these arguments do not suffice to cause the

court to order Commerce to reconsider the decisions it made in the Final Results that relate to the

use of Eiwlee's 2012 and 2013 financial statements to calculate the financial ratios.

---

       [18] The 2012 financial statements of Eiwlee Industrial Co., Ltd. ("Eiwlee") contain data
for 2011 and 2012 (Eiwlee's fiscal year is the calendar year).  *See* Ex. 2 to *Multilayered Wood
Flooring from the People's Republic of China: Second Administrative Review: Petitioners'
Comments Prior to Preliminary Results and Submission of Factual Information* (Nov. 3, 2014)
(P.R. Docs. 314-315) ("*Eiwlee's 2012 Financial Statements*").  Eiwlee's 2013 financial
statements contain data for 2012 and 2013.  *See* Ex. 1 to *Multilayered Wood Flooring from the
People's Republic of China: Second Administrative Review: Petitioners' Comments Prior to
Preliminary Results and Submission of Factual Information* (Nov. 3, 2014) (P.R. Docs. 314-315)
("*Eiwlee's 2013 Financial Statements*").

1.  Commerce Was Not Compelled by the Record Evidence to Choose Neotech's Financial
Statement over Eiwlee's Financial Statements Due to the Type of Merchandise Produced

For their argument that the Eiwlee statements are not the best available information,

plaintiffs point to the financial statement of a Thai producer of plywood, Neotech Plywood

Company Limited ("Neotech"), arguing that this is preferable to the statements of Eiwlee, which

produced, in addition to MLWF, products including wooden household products and wooden

furniture.[19]  They argue that the production process of these other products is less comparable to

the production process of subject merchandise than is the production process for plywood.  *See*

Senmao's Br. 15-23; Lumber Liquidators' Br. 2-8; Fine Furniture's Br. 27-29, 32-34; Jisen

Wood's Br. 3-4; Armstrong's Br. 4.  Senmao argues that the other products Eiwlee produces,

e.g., wooden furniture, involve a more complex production process than does MLWF and that

this production process differs from Senmao's MLWF production process to a greater degree

than the difference between the MLWF production process and that of plywood.  Senmao's

Br. 13, 15-16.  Senmao adds that "[a]ll three websites of Eiwlee indicate that Eiwlee is a member

of 'The Thai Furniture Industries Association' and the 'Thai Housewares Trade Association,'"

while "[n]o mention is made of any membership in any association of flooring producers."

Senmao's Br. 18.  Lumber Liquidators argues that "Commerce's use of Eiwlee's financial

statements was improper because it is a manufacturer of furniture and other merchandise more

complex than MLWF."  Lumber Liquidators' Br. 2.  According to Lumber Liquidators, the fact

that Eiwlee produces furniture "disqualifies it as a surrogate for financial ratios based on

---

[19] Eiwlee produces "woodenwares, wooden housewares, wooden kitchenwares, Thailand
wooden flooring, gift, decorative items, small furniture, and Thailand household wooden
products."  *Multilayered Wood Flooring from the People's Republic of China: Response to
Petitioner's Comments Prior to the Preliminary Results and Submission of Factual Information*
at Attach. (Nov. 13, 2014) (P.R. Doc. 318).

Commerce's prior decisions," pointing out that in the investigation Commerce concluded that

wooden bedroom furniture producers were less comparable to MLWF producers than were

plywood producers.  *Id.* at 3 (citation omitted).

Among the evidence Commerce relied upon was Eiwlee's website, which "describes

Eiwlee as 'one of Thailand's leading wood manufacturers and exporters of high quality wood

flooring (engineered wood flooring, solid wood flooring, & wood deck), and

woodenware/houseware/furniture'" and "states that Eiwlee 'is committed to producing highest

quality engineered hardwood flooring and woodenware in alignment with American and

European standards.'" *Final I&D Mem.* at 27 (citing *Multilayered Wood Flooring from the*

*People's Republic of China: Second Administrative Review: Petitioners' Comments Prior to*

*Preliminary Results and Submission of Factual Information* at Ex. 3 (Nov. 3, 2014) (P.R.

Docs. 314-315) ("*Pet.'s Pre-Prelim. Comments*")).  Commerce further noted that "one of

Eiwlee's websites is www.asianfloor.com" and that "there is no record evidence that establishes

the percentage of wood flooring Eiwlee produces as compared to any other products."  *Id.*

at 27-28 (footnote omitted).

While the record lacked quantitative evidence on the proportion of Eiwlee's production

that was multilayered wood flooring, the qualitative evidence consisting of Eiwlee's highlighting

its engineered wood flooring production on its website is sufficient to support the Department's

finding, *id.* at 27, that Eiwlee's MLWF production was significant.  Neotech produced plywood

but, according to the record evidence, did not produce MLWF.  Commerce did not err in placing

significant weight on that distinction.  As a laminated wood product, plywood has a physical

characteristic in common with MLWF, but still it is a different product.  Plaintiffs have not made

the case that the record compels the conclusion that the Neotech statement necessarily was the

better choice.  The record evidence, considered on the whole, was sufficient for Commerce to

conclude that the statement of Neotech was not preferable to those of Eiwlee because of Eiwlee's

production of merchandise in addition to MWLF.

2.  The Record Did Not Require Commerce to Reject the Eiwlee Statements for Receipt of a
Countervailable Subsidy

Fine Furniture, Yingyi-Nature, Jisen Wood, and Armstrong argue that the inclusion of an

entry for "packing credits" in Eiwlee's financial statements provided Commerce with reason to

believe or suspect that Eiwlee benefited from a countervailable subsidy.  *See* Fine Furniture's

Br. 21-27; Jisen Wood's Br. 4; Armstrong's Br. 4; *see also Eiwlee's 2012 Financial Statement* at

Note 7; *Eiwlee's 2013 Financial Statement* at Note 7.  These plaintiffs contend that because

Commerce "prefers to use financial statements without evidence of a countervailable subsidy,"

*Final I&D Mem.* at 30, Commerce erred in using Eiwlee's financial statements.  Rather than

support these arguments, the record supported the Department's decision not to reject the Eiwlee

financial statements on the ground that Eiwlee benefited from a countervailable subsidy.

Fine Furniture's argument relies, in part, on the legislative history of the Omnibus Trade

and Competitiveness Act of 1988, Pub. L. No. 100–418, 102 Stat. 1107 (1988).  *See* Fine

Furniture's Br. 21 (citing H.R. Rep. No. 100–576, at 590–91 (1988) (Conf. Rep.), *reprinted in*

1988 U.S.C.C.A.N. 1547, 1623–24 ("In valuing such factors [of production], Commerce shall

avoid using any prices which it has reason to believe or suspect may be dumped or subsidized

prices.  However, the conferees do not intend for Commerce to conduct a formal investigation to

ensure that such prices are not dumped or subsidized, but rather intend that Commerce base its

decision on information generally available to it at that time.")).

In past proceedings, Commerce has found certain government-provided export packing

credits to constitute countervailable subsidies.  *Final I&D Mem.* at 30 (citing as an example

*1,1,1,2-Tetrafluroethane From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62,597 (Int'l Trade Admin. Oct. 20, 2014)).  In this review, Commerce found the evidence insufficient to support a conclusion that Eiwlee "benefitted from a government-provided countervailable subsidy."  *Id.*  The record evidence in question consisted of a line item under Note 7 of Eiwlee's 2012 statement and a similar line item under Note 7 of Eiwlee's 2013 statement.  Note 7 of the 2013 statement is entitled "Overdraft and Short-term Borrowing from Financial Institutions," *see Eiwlee's 2013 Financial Statement* at Note 7, while Note 7 of the 2012 statement is entitled "Bank Overdrafts and Short-term Loans from Financial Institutions," *see Eiwlee's 2012 Financial Statement* at Note 7.  Each Note 7 lists the total overdraft and short-term borrowing for each of two fiscal years, broken down into four categories: "Bank overdraft," "Promissory notes," "Promissory notes sale agreement" (2013 statement) and "Agreements to sell promissory notes" (2012 statement), and "Packing credit."  *See Eiwlee's 2013 Financial Statement* at Note 7; *Eiwlee's 2012 Financial Statement* at Note 7.  A line item lists the combined interest expense for all four categories of credit and instructs that the credit is guaranteed with the Company's land and building and the director's personal guarantee in full.  *See Eiwlee's 2013 Financial Statement* at Note 7; *Eiwlee's 2012 Financial Statement* at Note 7.  For the packing credit, the interest rate is listed in both statements as "6.625% - 6.75%."  *See Eiwlee's 2013 Financial Statement* at Note 7; *Eiwlee's 2012 Financial Statement* at Note 7.

Commerce noted that "Eiwlee's financial statements only contain an item for 'packing credit,'" *Final I&D Mem.* at 30 (footnote omitted), and indeed the notes lack any reference to an *export* packing credit and any indication that the packing credit was provided by the government. Plaintiffs point to no record evidence indicating that this credit was an export credit or a

government-provided credit or that it was provided at a below-market interest rate.  As a result,

this record evidence was insufficient to compel Commerce to find that it had been presented with

a reason to believe or suspect that the data in the Eiwlee financial statements were distorted by a

government-provided, countervailable subsidy.

### 3.  Commerce Permissibly Relied upon Information in Eiwlee's 2013 Financial Statement that Pertained to 2012

Fine Furniture argues that Commerce should not have used the 2012 information from

Eiwlee's 2013 financial statements because of the issue raised by the auditor.  *See* Fine

Furniture's Br. 29-31.  According to Fine Furniture, "Commerce's decision to use data from a

financial statement that failed to comply with applicable accounting rules cannot be the 'best

available information' where other financial statements on the record were not disavowed by the

companies' own auditors."  Fine Furniture's Br. 30.  Fine Furniture further argues that

"Commerce relied on sheer speculation that Eiwlee's failure to follow Thai accounting rules had

no impact on 2012 data carried forward and restated in the tainted 2013 financial statement" and

that "Commerce places greater reliance on Eiwlee's accountants in 2013 than the company's

own auditor who conferred only a 'qualified opinion' with respect to the whole 2013 report,

including the 2012 data contained therein."  *Id.*

The language by which the auditor expressed her reasons for issuing a conditional

opinion on the 2013 Eiwlee financial statements refutes the premise of Fine Furniture's

arguments.  The auditor's entire explanation, presented in the Auditor's Report under the

heading "Criteria for Conditional Opinion for Material Misstatement (Insufficient Accounting

Audit Evidence)," was as follows:

> As at 1 January 2011, the Federation of Accounting Profession issued the
> reporting standard for Non-Publicly Accountable Entities which requires that the
> Company must provide estimate employee retirement benefit obligations.

However, the Company neither provided nor recorded estimate employee
retirement benefit obligations in accordance with such reporting standard in their
financial statements for the year ended 31 December 2013.  As a result, I was not
satisfied with the audit evidence regarding the estimate employee retirement
benefit for the year ended 31 December 2013 because I did not receive documents
and relevant information for the audit of such estimate from the Company.  I,
therefore, was unable to reach conclusion on the adjustment value for the estimate
employee retirement benefit.  Any adjustment, if any, may affect the presentation
of the Company's performance for the year ended 31 December 2013.

*Eiwlee's 2013 Financial Statement.*  Commerce did not rely on "sheer speculation" in

concluding that the 2012 data as restated in the 2013 financial statements was not affected by the

auditor's finding of noncompliance with a reporting standard.  As to any adjustment to correct

the deficiency in required reporting of estimated employee retirement benefit obligations, the

auditor stated that "[a]ny adjustment, if any, may affect the presentation of the Company's

performance for the year ended 31 December 2013."  *Id.*  Fine Furniture's argument that the

auditor "conferred only a 'qualified opinion' with respect to the whole 2013 report, including the

2012 data contained therein," Fine Furniture's Br. 30, is not persuasive because it is not the most

reasonable interpretation of the auditor's explanation.  Commerce was not unreasonable in

interpreting the auditor's statement of the reasons for issuing a conditional opinion to refer only

to the company's financial performance for 2013.  The auditor's statement under the heading

"Conditional Opinion" provides further support for the Department's conclusion that the auditor

did not consider the restated 2012 data to have been affected by the failure of the company to

follow the cited reporting standard:

> In my opinion, except the effect from the abovementioned issued [*sic*] for
> which I expressed conditional opinion, the financial statements referred to above
> present fairly, in all material respects, the statement of financial position as at
> 31 December 2013, and the results of operations for the year then ended of Eiwlee
> Industrial Co., Ltd. are in accordance with the reporting standard for Non-Publicly
> Accountable Entities.

*Eiwlee's 2013 Financial Statement*.  Therefore, substantial evidence is present on the record to

support the Department's finding that the auditor did not consider the restated 2012 information,

as presented in the 2013 financial statements, to have been affected by the noncompliance with

the reporting standard for estimated employee retirement benefit obligations.

<u>F.  Claims Challenging the Department's Surrogate Value for Foreign Inland Freight</u>

In calculating normal value according to 19 U.S.C. § 1677b(c), Commerce adds to the

price of material inputs a surrogate cost for the expense incurred for inland transportation of the

materials, to which it refers as "foreign inland freight" or "truck freight," to the point of

production.  It also applies its foreign inland freight surrogate cost to capture the expense of

transporting finished goods to the port of exportation, which it deducts from U.S. price (EP or

CEP).  Senmao, Yingyi-Nature, Jisen Wood, and Armstrong claim that the Department's

surrogate cost for foreign inland freight was unsupported by substantial evidence.  *See* Senmao's

Br. 23-29; Jisen Wood's Br. 5-6; Armstrong's Br. 4-5.

To calculate a surrogate cost for foreign inland freight in the second review, Commerce

relied in part on a World Bank report entitled *Doing Business 2014: Thailand*.  *See* Attach. V to

*Preliminary Results of the Second Administrative Review of Multilayered Wood Flooring from*

*the People's Republic of China: Surrogate Value Memorandum* (Dec. 31. 2014) (P.R.

Docs. 347-48) ("*Doing Business.*").  In a section entitled "Trading across Borders," the report

provides "indicators" for various costs associated with importing goods into Thailand and

exporting goods out of Thailand.  *Id.* at 72-79.  In a table entitled "Procedures to export," *Doing*

*Business* lists a cost of $210 for "Inland transportation and handling."  *Id.* at 78.  This cost is

presented in the report in association with three other costs, "Documents preparation" ($175),

"Customs clearance and technical control" ($50), and "Ports and terminal handling" ($160), for a

total cost of $595 for "Procedures to export." *Id.*  In a parallel table entitled "Procedures to

import," the report also lists a cost of $210 for "Inland transportation and handling." *Id.*

at 78-79.  This cost is also presented in the report in association with three other costs,

"Documents preparation" ($135), "Customs clearance and technical control" ($255) and "Ports

and terminal handling" ($160), for a total cost of $760 for "Procedures to import." *Id.*

     *Doing Business* states that its cost indicators, *inter alia*, "cover trade logistics, including

the time and cost of inland transport to the largest business city." *Id.* at 72.  "To make the data

comparable across economies, *Doing Business* uses several assumptions about the business and

the traded goods." *Id.*  Among the several assumptions are that the business "[i]s located in the

periurban area of the economy's largest business city" and that the traded goods "[a]re

transported in a dry-cargo, 20-foot full container load." *Id.*

     Commerce did not rely solely on *Doing Business* in calculating a surrogate cost for

foreign inland freight.  *See Final I&D Mem.* at 34-36.  Commerce also relied upon its own

previous decisions that it issued in prior reviews and investigations.  *See Final I&D Mem.* at 35

(citing, *inter alia*, *Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China:*

*Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value*

at 16-22 (Int'l Trade Admin. Apr. 28, 2014), *available at*

https://enforcement.trade.gov/frn/summary/prc/2014-10240-1.pdf (last visited June 5, 2018)).

Even were the court to presume that Commerce could rely on these documents as published

decisions (although they are not on the record of the second review), it would not alter the

court's conclusion that the record lacks the underlying information from which the findings

reached in these prior decisions were based.

Commerce supplemented the $210 cost from *Doing Business* with a determination that a

"20-foot, full container load" should be considered to weigh 10 metric tons, citing for this its

determination in *Monosodium Glutamate From the People's Republic of China: Final*

*Determination of Sales at Less Than Fair Value and the Final Affirmative Determination of*

*Critical Circumstances*, 79 Fed. Reg. 58,326 (Int'l Trade Admin. Sept. 29, 2014) and

accompanying Issues and Decision Memorandum, *Monosodium Glutamate from the People's*

*Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at*

*Less Than Fair Value* at 5-9 (Int'l Trade Admin. Sept. 22, 2014), *available at*

https://enforcement.trade.gov/frn/summary/prc/2014-23136-1.pdf (last visited June 5, 2018).[20]

*See Final I&D Mem.* at 34 n.117.  From that previous determination Commerce also adopted the

assumption that the $210 cost should be associated with a distance traveled of 77.165 kilometers.

*See id.* at 34 n.124.  Commerce explained its derivation of this distance as follows:

> While *Doing Business* does not specify which major port(s) in Thailand serves as
> the basis for its reporting rates, as we noted in our *Preliminary Results*, in
> *Prestressed Concrete* and other proceedings,[[21]] the Department determined that

---

[20] A website listed in *Doing Business 2014: Thailand*,
http://www.doingbusiness.org/methodlogy, states as to "[a]ssumptions about the traded goods"
that "[t]he traded product travels in a dry-cargo, 20-foot, full container load" and that it "weighs
10 tons and is valued at $20,000." *Trading Across Borders Methodology*, World Bank Group,
https://web.archive.org/web/20150107114039/http://www.doingbusiness.org/methodology/tradin
g-across-borders (last visited June 5, 2018); *see* Attach. V to *Preliminary Results of the Second*
*Administrative Review of Multilayered Wood Flooring from the People's Republic of China:*
*Surrogate Value Memorandum* at 103 (Dec. 31. 2014) (P.R. Docs. 347-48) ("*Doing Business*")
(indicating that the methodology for *Doing Business 2014: Thailand* can be found at the
aforementioned website).  The court has not been able to locate the information from this website
on the record of the second review.

[21] The reference to *Prestressed Concrete* is a reference to *Final Determination of Sales at*
*Less Than Fair Value: Presetressed Concrete Steel Rail Tie Wire From the People's Republic of*
*China*, 79 Fed. Reg. 25,572 (Int'l Trade Admin. May 5, 2014) and accompanying Issues and
Decision Memorandum, which Commerce cited in a footnote.  *See Final I&D Mem.* at 35 n.123
(citing, *inter alia*, *Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China:*
(continued . . .)

> there are two major ports in Thailand (Port of Bangkok (44.33 km from port to
> Bangkok Industrial Area); and Laem Chabang Port (110 km from port to Bangkok
> Industrial Area)).  In these other proceedings, we determined that it was
> reasonable to base our calculations on an average of those two distances.  The
> Department finds that the distances it used to calculate the SVs are consistent with
> the methodology employed by Doing Business in constructing its indicators given
> that the distances are calculated from a periurban area to Thailand's two major
> ports.[22]

*Final I&D Mem.* at 35 (footnotes omitted).  Thus, while obtaining the $210 cost estimate from

*Doing Business*, which was on the record of the proceeding below, Commerce relied upon

non-record sources for the weight of the loaded 20-foot container and the distance to and from

the major ports in Thailand.  Commerce interpreted the reference in *Doing Business* to the

"periurban area of the economy's largest business city" as reasonably justifying its basing its

distance determination on the distance to the ports from the "Bangkok Industrial Area," a term

*Doing Business* did not use.

Using the 77.165 kilometer distance, the weight of 10 metric tons, and the $210 cost that

it obtained from *Doing Business*, Commerce calculated a surrogate foreign inland freight cost of

$0.0002722 per kilogram, per kilometer.  *Multilayered Wood Flooring from the People's*

*Republic of China: Final Surrogate Value Memorandum* at Attch. III (Int'l Trade Admin.

---

(. . . continued)
*Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value*
at 16-22 (Int'l Trade Admin. Apr. 28, 2014), *available at*
https://enforcement.trade.gov/frn/summary/prc/2014-10240-1.pdf (last visited June 5, 2018).

22 In support of this finding, Commerce again cited *Monosodium Glutamate From the
People's Republic of China Final Determination of Sales at Less Than Fair Value and the Final
Affirmative Determination of Critical Circumstances*, 79 Fed. Reg. 58,326 (Int'l Trade Admin.
Sept. 29, 2014) and accompanying Issues and Decision Memorandum, *Monosodium Glutamate
from the People's Republic of China: Issues and Decision Memorandum for the Final
Determination of Sales at Less Than Fair Value* at 5-9 (Int'l Trade Admin. Sept. 22, 2014),
*available at* https://enforcement.trade.gov/frn/summary/prc/2014-23136-1.pdf (last visited
June 5, 2018).

July 8, 2015) (P.R. Doc. 419).  Senmao argues that "[t]he only information that is on the record

for Thailand is the flat per ton transportation and handling value of US $21/MT reported by

*Doing Business.*"  Senmao's Br. 28-29.  Senmao adds that "[i]f *Doing Business* is to be used,

then this rate can be used to calculate respondent's inland freight shipments" and that "[t]his

value represents a more accurate value because it is not based on unsupported assumptions that

are not tied to *Doing Business.*"  *Id.* at 29.  In the alternative, Senmao argues that Commerce

should have used record data from Indonesia instead of the Thai data that Commerce used in

determining the surrogate cost.  *Id.*  Senmao argues, further, that the Department's surrogate cost

calculation is flawed in another respect in that it presumes that "handling" occurs once every

77.165 kilometers when logic would dictate that it is incurred only once per shipment, when

goods are loaded or unloaded; i.e., Senmao argues that handling cost does not vary with

distance.[23]  Senmao's Br. 24-27 (arguing that "anything below 77.165 KM distance results in a

charge for 'handling' below the actual costs and anything above the 77.165 KM distance results

in a charge for 'handling' above the actual costs").  Yingyi-Nature, Jisen Wood, and Armstrong

also make the arguments advanced by Senmao.  *See* Jisen Wood's Br. 5-6; Armstrong's Br. 4-5.

    The court cannot sustain the Department's surrogate cost for foreign inland freight

because, apart from the record evidence supporting the $210 cost estimate, which consists of the

*Doing Business* report, the remaining elements of the Department's calculation depend on

information that is not on the record of the second review.  On remand, Commerce must

reconsider its surrogate cost and make a new determination that is based on factual findings, each

of which is supported by substantial evidence on the record, and that is based on sound

---

[23] The $210 cost estimate from *Doing Business* does not include "Ports and terminal
handling."  *Doing Business* at 78-79.

reasoning.  In redetermining a surrogate cost, Commerce is not bound to confine itself to the

evidence relating to Thailand and may consider all record evidence relevant to the determination

of a surrogate cost for foreign inland freight.

        Defendant raises various arguments as to why the court is required to sustain the

Department's surrogate cost for foreign inland freight, all of which are unpersuasive.  Defendant

argues that the Department's methodology is consistent with past practice and retains the internal

consistency of the Department's calculations.  Def.'s Br. 29-31.  As to the distance Commerce

used, defendant argues that the plaintiffs "do not cite evidence that other distances are more

appropriate or that the distances upon which Commerce relied are factually inaccurate."  *Id.*

at 32.  These arguments fail to address Senmao's objection that everything in the calculation not

obtained from *Doing Business* is absent from the record and is, therefore, unsupported

speculation.  Regardless of the Department's past practice, the court is unable to sustain a

determination that is based on factual findings for which there is no evidence present on this

administrative record.  Defendant maintains that plaintiffs have offered no evidence to support

the argument that handling cost does not vary with the distance traveled by the cargo, but this

argument also misses the point.  There is no record evidence to support the illogical premise that

handling cost *does* vary with distance traveled.  The $210 cost estimate is for "Inland

transportation and handling," for either an import or an export shipment, and there is no record

evidence as to how much was for handling and how much was for transport alone.  Senmao has

identified a flaw that detracts from the reasonableness of the Department's methodology.  There

might be instances in which a lack of record data makes a methodological flaw unavoidable, but

even in such a situation, the Department's method must be reasonable and adequately explained

based on the record evidence that exists and the choices that the evidence makes available.  Here,

the surrogate cost Commerce calculated is based in part on assumptions that record evidence does not support.

Defendant argues, further, that neither Senmao nor any other party preserved the argument that Commerce, in the alternative, should have used the data pertaining to Indonesia by exhausting administrative remedies before the agency.  Def.'s Br. 33.  The court does not reach defendant's exhaustion of remedies argument because the court is not ruling that Commerce, upon remand, is required to use any particular method of determining a surrogate cost.  Instead, the whole record is open to the Department's consideration.

G.  Fine Furniture's Claim that Commerce Unlawfully Denied Fine Furniture's Request to Be a Voluntary Respondent

Commerce did not assign Fine Furniture an individual weighted-average dumping margin.  Fine Furniture submitted a request to be a voluntary respondent, which had it been granted would have resulted in Fine Furniture's being assigned an individual weighted-average dumping margin in the review.  Commerce denied the request and included Fine Furniture among the separate-rate respondents assigned the 13.74% rate.  Fine Furniture claims the Department's denial of its request to be a voluntary respondent was contrary to law.  For the reasons discussed below, the court finds merit in this claim.

Paragraph (1) of subsection 777A(c) of the Tariff Act requires that Commerce "shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise."  19 U.S.C. § 1677f-1(c)(1).  An exception to this general requirement is contained within the same subsection, as follows:

> If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—

> (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or
>
> (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

*Id.* § 1677f-1(c)(2).  When Commerce invokes this exception, it typically limits the investigation or review to an examination of "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country" and determines the individual weighted-average dumping margins for only those exporters and producers.  *See id.*  That is the procedure Commerce followed in the second review.

A respondent not selected for individual examination potentially still may receive an individually-determined margin according to section 782(a) of the Tariff Act, which provides that Commerce, upon limiting the number of respondents according to section 777A(c), "shall establish an . . . individual weighted average dumping margin for any exporter or producer not initially selected for individual examination" if two conditions are met.  19 U.S.C. § 1677m(a) (prior to 2015 amendments).  The first condition applying to this "voluntary respondent" procedure is that an exporter or producer seeking individual examination submit "the information requested from exporters or producers selected for examination" by the same deadlines that apply to the selected respondents.  19 U.S.C. § 1677m(a)(1) (prior to 2015 amendments).  Fine Furniture satisfied this condition and thereby submitted a qualifying voluntary respondent request.  The second condition, which Congress addressed in section 782(a)(2), is at issue in this case.  Section 782(a)(2) provided Commerce discretion to deny a qualifying voluntary respondent request in certain circumstances.

On June 29, 2015, while Commerce was conducting the instant review, Congress

amended section 782(a)(2), among other provisions in the antidumping duty and countervailing

duty statute.  *See* Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 506,

129 Stat. 362, 386-87 (2015) ("TPEA").  Prior to the amendment to section 782(a)(2), which was

made by section 506 of the TPEA, Commerce was required to accept a qualifying voluntary

respondent request if "the number of exporters or producers who have submitted such

information is not so large that individual examination of such exporters or producers would be

unduly burdensome and inhibit the timely completion of the investigation."  19 U.S.C.

§ 1677m(a)(2) (prior to 2015 amendments).  As amended by the TPEA, the provision

(renumbered as section 782(a)(1)(B)) allowed Commerce to deny a qualifying request if "the

number of exporters or producers subject to the investigation or review is not so large that any

additional individual examination of such exporters or producers would be unduly burdensome

to the administering authority and inhibit the timely completion of the investigation or review."

19 U.S.C. § 1677m(a)(1)(B) (post 2015 amendments).  The TPEA also added a provision (the

new section 782(a)(2)) giving a broad definition to the term "unduly burdensome" and allowing

Commerce to consider any factors relating to the timely completion of an investigation and

review that it considers appropriate.[24]

---

[24] New section 782(a)(2) provides that:

     In determining if an individual examination under paragraph (1)(B) would
be unduly burdensome, the administering authority may consider the following:
     (A) The complexity of the issues or information presented in the
proceeding, including questionnaires and responses thereto.
     (B) Any prior experience of the administering authority in the same or
similar proceeding.
     (C) The total number of investigations under Part I [countervailing duty]
or II [antidumping duty] of this subtitle and reviews under section 1675 of this
(continued . . .)

The TPEA amendment expanded considerably the discretion Commerce could exercise in

denying a qualifying voluntary respondent request.  Because the TPEA did not specify an

effective date for the change in section 782(a)(2), nothing in the TPEA expressly precluded

Commerce from applying its new discretion in the instant review, which was concluded upon the

publication of the Final Results on July 15, 2015 and therefore after the June 29, 2015 date of the

amendment.  *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (stating principle that

"absent a clear direction by Congress to the contrary, a law takes effect on the date of its

enactment"); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1352 (Fed.

Cir. 2015) (holding that Section 502 of the TPEA "unambiguously applies only to Commerce

determinations made after the date of enactment").

Nevertheless, Commerce decided to delay until August 6, 2015 the date on which it

would exercise the expanded discretion afforded by the amendment to section 782(a)(2).  This

was the date of publication of an interpretive rule Commerce issued to address the question of

the dates upon which it would apply the various provisions of the TPEA.  *Dates of Application of

Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences

Extension Act of 2015*, 80 Fed. Reg. 46,793, 46,795 (Int'l Trade Admin. Aug. 6, 2015)

("*Interpretive Rule*") (stating that Commerce will "apply this provision [section 506 of the

TPEA] to determinations made on or after August 6, 2015").  In the instant review, Commerce

acted upon Fine Furniture's voluntary respondent request under the old version of

---

(. . . continued)

title being conducted by the administering authority as of the date of the
determination.
      (D) Such other factors relating to the timely completion of each such
investigation and review as the administering authority considers appropriate.

19 U.S.C. § 1677m(a)(2) (post 2015 amendments).

section 782(a)(2) and the more limited level of discretion that it provided. *Final I&D Mem.*
at 14.

The court will review the Department's rejection of Fine Furniture's voluntary
respondent request under the prior version of the statute, i.e., under the narrower discretion to
which Commerce voluntarily limited itself, for two reasons. First, a court must review an agency
decision according to the reasoning the agency puts forth. *Motor Vehicle Mfrs. Ass'n of U.S.,
Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[A]n agency's action must be
upheld, if at all, on the basis articulated by the agency itself."). Second, no party to this action is
contesting the Department's decision to apply the older version of the statute or challenging the
validity of the interpretive rule setting forth a post-enactment date upon which Commerce would
apply its expanded discretion.

After referring to the submission of information by certain parties to an investigation or
review, the pre-TPEA version of section 782(a)(2) places a specific limitation on the
Department's discretion to deny "qualifying" voluntary respondent requests, i.e., requests by
respondents who have submitted by the applicable deadlines the information requested from
exporters or producers selected for examination. 19 U.S.C. § 1677m(a)(2) (prior to 2015
amendments). Read in pertinent part, the statute reads as follows:

> [T]he administering authority shall establish . . . an individual weighted average
> dumping margin for any exporter or producer . . . who submits to the
> administering authority the information requested from exporters or producers
> selected for examination, if . . . *the number of exporters or producers who have
> submitted such information* is not so large that individual examination *of such
> exporters or producers* would be unduly burdensome and inhibit the timely
> completion of the investigation.

19 U.S.C. § 1677m(a) (prior to 2015 amendments) (emphasis added). Under the provision, the
general rule is that Commerce will examine individually all such requesters. The exception,

which as an exception to a general rule should be read narrowly, allows Commerce to review fewer than all requesters.

According to plain meaning, the reference to "the number of exporters or producers who have submitted such information" and the later reference to "such exporters or producers" must be read to refer to the same group of exporters or producers. *See* 19 U.S.C. § 1677m(a)(2) (prior to 2015 amendments). Nevertheless, the provision is not without ambiguity. The interpretive question that arises is whether both are references to the exporters or producers who have submitted the information as necessary in order to be considered as voluntary respondents, or whether both are references to *all* exporters and producers who have submitted the information "requested from exporters or producers selected for examination," i.e., the mandatory respondents plus the respondents requesting treatment as voluntary respondents. In this instance, the court is not called upon to answer the question as to which interpretation should be preferred because Commerce has settled the question by adopting the former interpretation.

Specifically, for the Final Results Commerce interpreted the phrase "number of exporters or producers who have submitted such information" to include only the exporters or producers who voluntarily have submitted "the information requested from exporters or producers selected for examination," 19 U.S.C. § 1677m(a) (prior to 2015 amendments), i.e., the requesters for voluntary respondent status, not the total number of exporters or producers who have submitted the information (which also would include the mandatory respondents). *See Final I&D Mem.* at 14 (interpreting those words to mean "the number of such companies that have *voluntarily* provided such information" (emphasis added)). Where a statute is susceptible to more than one interpretation, a court will defer to the agency's interpretation if it is a reasonable one. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The court

considers the Department's interpretation reasonable because it is consistent with the plain

meaning and the context of the provision as a whole.

    The Department's interpretation raises another issue of statutory construction that the

court must consider.  This issue is the intended meaning of the term "so large" as used in the

clause "not so large that individual examination of such exporters or producers would be unduly

burdensome and inhibit the timely completion of the investigation."  19 U.S.C. § 1677m(a)(2)

(prior to 2015 amendments).  The words "so large" necessarily signal an intended comparison

with another number that is relatively smaller.  The difficulty posed by this case is that the

"number of exporters or producers" was one.  This is the smallest possible number that can exist

in any situation in which the voluntary respondent procedure could be invoked.

    Commerce impliedly interpreted the statute such that the number in question—one—is

"so large" as to allow it to reject Fine Furniture's voluntary respondent request, even though it

was the only such request pending before it in the second review.  When examining this

interpretation according to the two-step process required by *Chevron*, the court must conclude

that this interpretation is unreasonable on its face.  According to plain meaning, as well as logic,

a number cannot be "so large" in comparison with another number, and, at the same time, be as

small as it possibly can be.  The general rule established by 19 U.S.C. § 1677m(a) (prior to 2015

amendments) is that Commerce must examine individually *all* exporters and producers that

requested voluntary respondent treatment; the exception allows Commerce to examine *fewer*

than all of them if the number of requestors is "so large that individual examination of such

exporters or producers would be unduly burdensome and inhibit the timely completion of the

investigation."  19 U.S.C. § 1677m(a) (prior to 2015 amendments) ("the administering authority

shall establish . . . an individual weighted average dumping margin for *any* exporter or

producer . . . who submits to the administering authority the information requested" (emphasis

added)).  Under the Department's interpretation, Commerce may avoid reviewing *any* requestor

of voluntary respondent status even if the number of requestors is as small as possible.  The

court, therefore, rejects this interpretation under "step one" of the *Chevron* analysis as contrary to

plain meaning.[25]  The Supreme Court stated in *Chevron* that "[f]irst, always, is the question

whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is

clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-843 (footnote omitted).

"If a court, employing traditional tools of statutory construction, ascertains that Congress had an

intention on the precise question at issue, that intention is the law and must be given effect."  *Id.*

at 843 n.9.

Regarding congressional intent, the Statement of Administrative Action accompanying

the Uruguay Round Agreements Act ("SAA") does not compel a conclusion that the

Department's implied interpretation of the term "not so large" is reasonable.  The SAA discusses

the voluntary respondent procedure as follows:

(3) Treatment of Voluntary Respondents

Section 231 of the bill adds section 782(a) to the Act which provides that,
in cases where Commerce has limited its examination to selected exporters and
producers, it nevertheless will calculate an individual dumping margin for any
exporter or producer not selected for examination that provides the necessary
information on a timely basis and in the form required.  Although Commerce,

---

[25] This Court's decision in *Tri Union Frozen Products, Inc. v. United States*, 40 CIT __,
163 F. Supp. 3d 1255, 1279-85 (2016), is distinguishable.  That case did not review the statutory
construction of 19 U.S.C. § 1677m(a) (prior to 2015 amendments) that Commerce put forth in
this review.

consistent with Article 6.10.2 of the Agreement,[26] will not discourage voluntary responses and will endeavor to investigate all firms that voluntarily provide timely responses in the form required, in certain cases (including cases involving the same product from multiple countries) where the number of exporters or producers is particularly high, Commerce may decline to analyze voluntary responses because it would be unduly burdensome and would preclude the completion of timely investigations or reviews. Section 782(a) generally codifies existing practice.

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R.

Rep. No. 103–316, Vol. 1 at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201.  The first

sentence establishes the general principle that Commerce must examine individually all

companies that voluntarily submit the requisite responses and in fact states the principle in the

absolute.  The second sentence provides an exception to the general principle, referring to

"certain cases" in which "the number of exporters or producers is particularly high," and in so

doing might be referring to those requesting voluntary respondent status, consistent with the

reference earlier in the sentence.  Although it is possible to read the reference to "the number of

exporters or producers" as also including the number of the mandatory respondents, this is not

the only plausible reading.  In any event, the SAA does not lend support to the Department's

---

[26] Article 6.10.2 of the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 provides as follows:

> In cases where the authorities have limited their examination, as provided for in this paragraph [based on statistically valid sampling or largest export volume], they shall nevertheless determine an individual margin of dumping for any exporter or producer not initially selected who submits the necessary information in time for that information to be considered during the course of the investigation, except where the number of exporters or producers is so large that individual examinations would be unduly burdensome to the authorities and prevent the timely completion of the investigation.  Voluntary responses shall not be discouraged.

Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1868 U.N.T.S. 201 (1994).

construction, which is at odds with plain meaning and logic.  Consistent with the plain meaning

of the statute, the SAA clarifies that the procedure described in the second sentence is intended

as an exception to the general rule set forth in the first sentence, which is that Commerce will

examine individually *all* respondents who voluntarily and timely submit responses in the correct

form.  Only when the number of exporters or producers is "particularly high" may Commerce

deviate from the general rule by examining fewer than all such requesters.

 In determining that examining Fine Furniture would be "unduly burdensome,"

Commerce noted that neither of the mandatory respondents had previously been subject to an

individual review, that the Department "needed to submit multiple questionnaires in order to

become familiar with both companies' corporate structures, sales and FOPs," and that its

"analysis of Dajen was especially complicated due to its possible affiliations with several other

companies located in different countries."  *Final I&D Mem.* at 15.  Commerce also cited its

"current resource availability."  *Id.*  From these findings, Commerce determined that individually

examining Fine Furniture would be "unduly burdensome and inhibit the timely completion of the

review."  *Id.*  Because Commerce has based its inquiry on an unreasonable construction of the

governing statutory provision, the court does not reach the issue of whether these findings, and

the ultimate determination not to examine Fine Furniture as a voluntary respondent, are

supported by substantial record evidence.

 In summary, the court concludes that Commerce, having decided that the "number" of

exporters or producers to be considered is the number of requestors for voluntary respondent

status, has adopted a statutory interpretation that necessarily implicates the issue of the proper

meaning of the words "not so large that individual examination of such exporters or producers

would be unduly burdensome and inhibit the timely completion of the investigation."  19 U.S.C.

§ 1677m(a)(2) (prior to 2015 amendments).  Further, the court holds impermissible the

Department's implicit interpretation of those words such that the number one can be "so large"

for purposes of the statutory standard.  Therefore, the court cannot sustain the Department's

decision to reject Fine Furniture's voluntary respondent request on the reasoning Commerce put

forth.

        Defendant argues that Fine Furniture failed to exhaust its administrative remedies for

certain of the arguments it makes before the court, having raised in its case brief before

Commerce "that Commerce may only decline to review voluntary respondents where they

represent a large number."  Def.'s Br. 37.  The court disagrees with the implication that Fine

Furniture raised only that argument.  *See Administrative Review of the Antidumping Duty Order*

*on Multilayered Wood Flooring from the People's Republic of China: Case Brief for*

*Consideration Prior to the Final Results* 11-16 (Feb. 9, 2015) (P.R. Doc. 386).  Moreover, the

argument defendant identifies as being included in Fine Furniture's case brief is a meritorious

one, for the reasons the court discussed above.  Defendant argues that, in any event, Commerce

in this instance reasonably exercised its discretion to refuse to allow Fine Furniture to serve as a

voluntary respondent.  The court is unable to agree with this argument because Commerce

denied the voluntary respondent request based on faulty reasoning.  As the court has explained,

that reasoning was grounded in an impermissible interpretation of section 782(a)(2) as it existed

prior to amendment by the TPEA.  Commerce, therefore, must reconsider its decision to deny

Fine Furniture's voluntary respondent request.

        H.  Claims that Commerce Impermissibly Made a Deduction from U.S. Price of 8% of the
        Export Value of Senmao's Subject Merchandise to Account for Irrecoverable Value-Added Tax

        Yingyi-Nature, Jisen Wood, and Armstrong, joined by Old Master, Yihua, Fine

Furniture, and the Penghong Plaintiffs, challenged as unlawful a downward adjustment

Commerce made in determining the export price of Senmao's subject merchandise, pursuant to

19 U.S.C. § 1677a(c)(2)(B), for what Commerce described as "irrecoverable" value-added tax

imposed by the PRC government.[27]  *See* Jisen Wood's Br. 7; Armstrong's Br. 6; Old Master's

Br. 5; Yihua's Br. 2; Fine Furniture's Br. 34; Penghong's Br. 9.  Because the Department's

adjustment to Senmao's starting price for irrecoverable VAT was based on an invalid factual

finding and accordingly was contrary to law, the court remands the determination of export price

to the Department for corrective action.

Under section 731 of the Tariff Act, 19 U.S.C. § 1673, an antidumping duty is imposed

"in an amount equal to the amount by which the normal value exceeds the export price (or the

constructed export price) for the merchandise." 19 U.S.C. § 1673.  Section 772 of the Tariff Act,

19 U.S.C. § 1677a, determines export price ("EP") and constructed export price ("CEP") by

making various adjustments to "[t]he price used to establish export price and constructed export

---

[27] The Senmao Plaintiffs voluntarily dismissed their claim challenging the Department's "determination regarding the offset to U.S. price for the Value Added Tax ('VAT')." Compl. ¶ 19 (Aug. 10, 2015), ECF No. 7; *see* Order (Apr. 20, 2017), ECF No. 120 (dismissing Count Three of Senmao's complaint).  Prior to the dismissal, all other plaintiffs and plaintiff-intervenors who were respondents in the second review either asserted this claim or joined in it as plaintiff-intervenors.  *See* Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. upon the Agency R. by Consol. Pl. Old Master Products, Inc. 5 (Mar. 22, 2016), ECF No. 70; Mem. in Supp. of Rule 56.2 Mot. for J. upon the Agency R. by Consol. Pls. Armstrong Wood Products (Kushan) Co., Ltd. and Armstrong World Industries, Inc. 6 (Mar. 22, 2016), ECF No. 68-1; Pls. Dunhua City Jisen Wood Industry Co., Ltd. and Yingyi-Nature (Kunshan) Wood Industry Co., Ltd. Mem. in Supp. of Mot. for J. on the Agency R. 7-8 (Mar. 22, 2016), ECF No. 69-2; Pl.-Intervenor Guangdong Yihua Timber Industry Co., Ltd.'s Rule 56.2 Mot. for J. on the Agency R. 2 (Mar. 22, 2016), ECF No. 71; Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. upon the Agency R. by Consol. Pl. Fine Furniture (Shanghai) Ltd. 34 (Mar. 15, 2016), ECF No. 62-1; Mem. of P. & A. in Supp. of Consol. Pls.' 56.2 Mot. for J. on the Agency R. 9 (Mar. 22, 2016), ECF No. 72-1; *see also* Order, *Dunhua City Jisen Wood Industry Co. v. United States*, No. 15-204 (Aug. 28, 2015), ECF No. 35 (granting Lumber Liquidator's motion to intervene).

price," 19 U.S.C. § 1677a(c); Commerce refers to the unadjusted price for determining EP and

CEP as the "starting price."[28]  *See* 19 C.F.R. § 351.402(a).

Section 772(c)(2)(B) of the Tariff Act directs Commerce to reduce the starting price by

"the amount, if included in such price, of any export tax, duty, or other charge imposed by the

exporting country on the exportation of the subject merchandise to the United States, other than

an export tax, duty, or other charge described in section 1677(6)(C) of this title."[29] 19 U.S.C.

§ 1677a(c)(2)(B).  An adjustment made under this provision reduces EP and CEP starting prices

and thereby increases any dumping margin.  In calculating Senmao's 13.74% margin, Commerce

deducted from the prices used to establish export price amounts it calculated as 8% of the export

value of the subject merchandise, based on what Commerce considered to be the amount of

"irrecoverable VAT," a term Commerce used to describe VAT that is paid on materials used in

producing the subject merchandise ("input VAT") and that is not refunded upon the exportation

of that merchandise.  *See Prelim I&D Mem.* at 19; *Final I&D Mem.* at 12-13.  In this review,

Commerce calculated "irrecoverable VAT" as the difference between a 17% VAT rate it found

that China imposed on material inputs used in producing the subject merchandise and a 9% VAT

---

[28] The starting price for determining export price is "the price at which the subject
merchandise is first sold (or agreed to be sold) before the date of importation by the producer or
exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in
the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C.
§ 1677a(a). The starting price for determining constructed export price is "the price at which the
subject merchandise is first sold (or agreed to be sold) in the United States before or after the
date of importation by or for the account of the producer or exporter of such merchandise or by a
seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or
exporter." *Id.* § 1677a(b).

[29] An export tax, duty, or other charge described in 19 U.S.C. § 1677(6)(C) is an export
tax, duty, or other charge "levied on the export of merchandise to the United States specifically
intended to offset the countervailable subsidy received."  19 U.S.C. § 1677(6)(C).

"refund rate" Commerce concluded was allowed upon exportation of that merchandise.  *Final I&D Mem.* at 13.

Yingyi-Nature, Jisen Wood, Old Master, and Armstrong, joined by other plaintiffs who were producers or exporters and respondents in the second review, claim that the 8% deduction Commerce made in calculating Senmao's margin was unsupported by substantial evidence and therefore unlawful.  These plaintiffs incorporate the arguments made by Senmao.  *See* Senmao's Br. 29-34; *see also* Old Master's Br. 5 (incorporating Senmao's arguments); Armstrong's Br. 6 (same); Jisen Wood's Br. 7 (same); Fine Furniture's Br. 34 (same); Yihua's Br. 2 (same).

Yingyi-Nature and Jisen Wood argue that "[t]he Department's 8 percent unrefunded VAT deduction from the U.S. price is not reflective of the actual amount of the VAT assessed by the Government of China ('GOC') on Senmao's exports and is thus not supported by substantial evidence."  Jisen Wood's Br. 7.  Yingyi-Nature and Jisen Wood are correct.  The record does not contain substantial evidence, or any evidence, to support a finding of fact that the PRC imposed a tax, duty, or charge in the amount of 8% "on Senmao's exports."  Commerce based its ultimate factual finding that China did impose such an 8% tax, duty, or charge on Senmao's exported merchandise on various subordinate findings, but among them is a critical finding the record evidence does not support.  Commerce found that what it considered to be irrecoverable input VAT "amounts to a tax, duty or other charge imposed on exports *that is not imposed on domestic sales.*"  *Final I&D Mem.* at 12-13 (emphasis added).  This finding is contradicted by the record evidence consisting of Senmao's questionnaire responses and attachments thereto, which explain in detail the VAT system to which Senmao was subject.  The record evidence fails to demonstrate that, under China's VAT system, Senmao's domestic sales did not incur irrecoverable VAT.

Commerce compared "the PRC's VAT regime" to what it called a "typical VAT system," under which, it presumed, all VAT incurred by a company in producing goods for export is rebated. *Id.* at 12.  According to China's VAT regime as interpreted by Commerce, a company in China producing merchandise for export pays a value-added tax on the materials used in producing the subject merchandise (i.e., the VAT to which Commerce referred as "input VAT") and, due to exportation, is "refunded" only a portion of that input VAT. *Final I&D Mem.* at 12 (finding that the PRC's VAT regime, as opposed to a "typical VAT system," is one "where some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded" (footnote omitted)).  The Department's finding that this unrefunded ("irrecoverable") portion of the "input" VAT "amounts to a tax, duty, or other charge imposed on exports that is not imposed on domestic sales," *id.* at 12-13, cannot be reconciled with the relevant submissions Senmao made for the record.  These submissions included a response to Sections C&D of the Department's initial questionnaire with various exhibits (including copies of PRC VAT regulations).

Senmao's questionnaire response explained that it was subject to value-added tax liability on sales of its finished products (whether sold in the domestic market or for export) but did not pay to the tax authority a VAT on materials it used in producing its goods. *Multilayered Wood Flooring from the People's Republic of China: Section C&D Response* at C-33 – C-36 (June 30, 2014) (P.R. Doc. 238) ("*Senmao's Sections C&D Response*").  Senmao further explained that the VAT of 17% on the materials was included in the prices it paid for those materials and was available as a deduction from the liability to the tax authority for "VAT-out" (output VAT) on the combined sales, both domestic and export, of the finished products.  In other words, the 17% VAT applicable to materials Senmao used in production was VAT paid by

its material suppliers and passed on to Senmao.  *Id.*  Senmao described the Chinese VAT system as follows:

> According to Article 4 of the VAT Regulations of China, the formula for the calculation of the VAT payable is: VAT payable = VAT-out – VAT-in.  The "VAT-out" refers to the sales value of the product times the applicable VAT rate, and the "VAT-in" refers to the theoretical VAT, i.e. not an actual VAT paid to the tax authority, contained in the purchase values of the materials used in the production of the sold goods.  In other words, regardless of whether the sales are made in domestic or to foreign markets, the VAT payable is the difference between the VAT-out and the VAT-in.[30]

*Id.* at C-34.  With respect to "VAT-out," Senmao further explained that the VAT rate applicable to its finished products sold domestically is 17% and that its finished products sold for export are subject to VAT-out at a reduced rate, calculated according to a 9% reduction from the 17% rate, for a VAT-out rate of 8%.  *Id.* at C-35.  Senmao summarized the calculation of its VAT liability by stating that "the final formula for calculation of the total value levied on both the domestic and export sale[s] is: VAT payable = VAT-out of domestic sales + FOB [free-on-board] price of the export good x 8% - value VAT-in of all materials purchased."  *Id.*  Because its "VAT-in" exceeded its liability for "VAT-out," i.e., the output VAT, the result of the calculation was that Senmao paid no output VAT on its sales of its exported merchandise.  *Senmao's Sections C&D Response* at Exhibit C-5.

---

[30] An attachment to Senmao's questionnaire response, "Interim Regulations for the People's Republic of China on Value-added Tax (Revision in 2008)," is consistent with Senmao's explanation.  *See Multilayered Wood Flooring from the People's Republic of China: Section C&D Response* at Ex. C-3 (June 30, 2014) (P.R. Doc. 238) ("*Senmao's Sections C&D Response*").  Article 8 of those regulations provides that "[f]or taxpayers who purchase goods . . . value-added tax paid or borne shall be the input tax," and Article 4 provides that the "Tax payable = Output tax payable for the current period – input tax for the current period."  *Id.*  Article 5 specifies that "the output tax shall be the value-added tax payable calculated on the basis of the sales amounts involved and the tax rates prescribed in Article 2 of these Regulations."  *Id.*  Under Article 2, the generally-applicable tax rate "shall be 17%."  *Id.*

Commerce stated in the Final Issues and Decision Memorandum that "[i]n the Section C response in field 45.0, Senmao reported that it incurred zero net VAT expense based on its own formula derived by an allocation on all VAT paid for inputs of merchandise for both domestic and export markets." *Final I&D Mem.* at 13. That was not in fact what Senmao reported and that was not what Commerce asked in the questionnaire. *See 2012 - 2013 Antidumping Administrative Review of Multilayered Wood Flooring from-the People's Republic of China: Antidumping Questionnaire* at C-26 – C-27 (Int'l Trade Admin. May 15, 2014) (P.R. Doc. 192). Commerce did not ask Senmao to report its "net VAT expense." *See id.* Section C of the initial questionnaire directed that "[i]f you pay value-added taxes on your merchandise sold to the United States and those taxes are not rebated upon export, report them here" and that "[i]f you paid no such taxes, please provide official government documentation to demonstrate that you were entitled to a 100% rebate on such taxes." *Id.* at C-26. Senmao interpreted this question to refer to VAT for which it was liable for payment, i.e., output VAT, not VAT that it paid to its suppliers (input VAT). *See Senmao's Sections C&D Response* at C-33 – C-36. Because the questions to Senmao referred to taxes that "you paid," Senmao's interpretation of the question was understandable. In response to the Department's questionnaire, Senmao, referring to output VAT, informed Commerce that "[s]ince the actual VAT on the export sales to the U.S. is a negative figure, we report '0' in this field." *Id.* at C-36. Commerce rejected Senmao's calculation of its VAT liability and proceeded to reach a finding, unsupported by the record evidence, that Senmao had incurred "irrecoverable" input VAT of 8% of the export value of its subject merchandise. *Final I&D Mem.* at 12-13.

Exhibit C-5 to Senmao's Sections C&D Questionnaire Response ("VAT Calculation") provided data showing the amount of "VAT-in" that Senmao incurred during the POR in its

purchases of materials.  *Senmao's Sections C&D Response* at Ex. C-5.  According to the record

evidence provided by Senmao, the input VAT served as a deduction from potential output VAT

liability but did not serve as a basis for a "refund" or "rebate" of input VAT such that 8% of this

input VAT was not recovered by reason of exportation of the merchandise.[31]  The more

important point, however, is that Commerce lacked evidentiary support for its finding that under

the PRC's VAT system a producer of exported merchandise such as Senmao did not incur

irrecoverable input VAT on domestic sales.  To the contrary, the record evidence consisting of

Senmao's questionnaire responses and its exhibits demonstrates that Senmao incurred

irrecoverable input VAT on both its domestic and its export sales.[32]  According to that evidence,

the difference between its domestic sales and its export sales, with respect to treatment under the

Chinese VAT system, was that the export sales received a preferential reduction of 9% from the

generally-applicable 17% rate for *output* VAT, resulting in a preferential VAT rate of 8% on the

sales for export.

---

[31] Exhibit C-5 to Senmao's Sections C&D Questionnaire Response ("VAT Calculation"), the data in which is claimed as confidential business information, compares the amount of input VAT to the potential liability for output VAT.  *See Senmao's Sections C&D Response* at Ex. C-5.

[32] Although Senmao could seek to "recover" its input VAT as part of the total amount it obtains from buyers of its merchandise, that would appear to be true regardless of whether the buyer is domestic or foreign.  Under the Article 21 of the PRC VAT regulations Senmao attached to its questionnaire response, some Chinese purchasers of Senmao's product could obtain "special invoices for value-added tax": "Taxpayers that sell goods or taxable services shall issue special invoices for value-added tax to purchasers that ask for such invoices and specify both sales amounts and output tax in such invoices."  *Senmao's Sections C&D Response* at Ex. C-3.  This option is not available in some circumstances, such as sales by small-scale taxpayers or to individual consumers, and it is not available "[w]here tax exemption provisions are applicable to goods or taxable services that are sold."  *Id.*  In any event, the evidence consisting of the VAT regulations would establish only that any deduction from output VAT liability that may be enabled by such invoices would reduce the output VAT liability of Senmao's purchaser, not that of Senmao.

The Department's erroneous finding that irrecoverable input VAT "amounts to a tax, duty or other charge imposed on exports that is not imposed on domestic sales," *Final I&D Mem.* at 12-13, was a critical error, for it was an essential part of the reasoning by which Commerce found that irrecoverable input VAT amounts to a "tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States" within the meaning of 19 U.S.C. § 1677a(c)(2)(B). Commerce stated that the intent of its practice of deducting 8% as "a fixed percentage of EP" was "arriving at a tax neutral dumping comparison." *Id.* at 13 (citing *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36,481, 36,483 (Int'l Trade Admin. June 19, 2012)). But an input VAT incurred upon the purchase of materials for use in production of goods both for export sale and domestic sale cannot correctly be found in fact to be a tax, duty, or charge that is not imposed on domestic sales. The Department's reasoning that the irrecoverable input VAT must be deducted from EP starting prices in order to attain tax neutrality is based on that erroneous finding. There is no record evidence from which Commerce could find that Senmao's export sales incurred a "tax, duty, or other charge" that its domestic sales avoided. Under the Chinese VAT system as shown by the evidence placed on the record by Senmao, export sales were not treated less favorably than were domestic sales (and in fact were treated more favorably).

In summary, it cannot be shown on the record of this case that, as Commerce presumed, irrecoverable input VAT is incurred under the Chinese VAT scheme exclusively with respect to export sales. Instead, the evidence placed on the record by Senmao is that the PRC VAT system imposes input VAT on the materials used in all production of a good, whether or not the finished good subsequently produced is exported. Therefore, the evidence of record does not support the

Department's ultimate finding that the tax in question "amounts to" an export tax, duty, or charge imposed by the exporting government on the exportation of the subject merchandise.[33] Simply stated, input VAT incurred on materials used in domestic production that is not rebated or refunded upon the sale of the good (whether domestically or to an export market) made from those materials cannot, as a factual matter, "amount to" something it is not.

In conclusion, the Department's decision to make the deductions from Senmao's EP starting prices for "irrecoverable" input VAT was erroneous because it was based on a critical finding of fact, i.e., that irrecoverable input VAT did not occur on domestic sales, that was unsupported by record evidence and illogical.  On remand, Commerce must reach a new determination on the VAT issue that does not have these deficiencies.

---

[33] Because the record evidence is at variance with the factual findings Commerce made about Chinese VAT as imposed on Senmao, the court need not reach in this case the question of whether Chinese irrecoverable VAT, when considered according to the Department's findings and interpretations pertaining to the functioning of the PRC's VAT regulations, falls within the intended scope of 19 U.S.C. § 1677a(c)(2)(B).  That question has been considered in various decisions by this Court.  *Compare Qingdao Qihang Tyre Co. v. United States*, 42 CIT __, __, Slip Op. 18-35 at *7-27 (Apr. 4, 2018) (holding that Chinese value-added tax, when considered according to the Department's own finding of fact that it is imposed on materials used in producing exported subject merchandise, whether or not refunded upon exportation of the finished good, is not an "export tax, duty, or other charge" within the meaning of the statutory phrase and that Congress had a specific intent to the contrary), *with Jacobi Carbons AB v. United States*, 42 CIT __, __, Slip Op. 18-46 at *50-60 (Apr. 19, 2018) (concluding that Department's interpretation that Chinese irrecoverable VAT falls within the statutory phrase "export tax, duty, or other charge" is entitled to deference), *Aristocraft of Am., LLC v. United States*, 41 CIT __, __, 269 F. Supp. 3d 1316, 1321-26 (2017) (same), *Jacobi Carbons AB v. United States*, 41 CIT __, __, 222 F. Supp. 3d 1159, 1186-88 (2017) (same), *Diamond Sawblades Mfrs.' Coal. v. United States*, 42 CIT __, __, Slip Op. 18-28 at *4-12 (Mar. 22, 2018) (same), *Juancheng Kangtai Chem. Co. v. United States*, 41 CIT __, __, Slip Op. 17-3 at *25-31 (Jan. 19, 2017) (same), *and Fushun Jinly Petrochemical Carbon Co. v. United States*, 40 CIT __, __, Slip Op. 16-25 at *20-25 (Mar. 23, 2016) (same); *see also China Manufacturers Alliance, LLC v. United States*, 41 CIT __, __, 205 F. Supp. 3d 1325, 1344-51 (2017).  In this case, plaintiffs do not specifically challenge the Department's statutory interpretation of 19 U.S.C. § 1677a(c)(2)(B) and instead challenge the Department's decision to make the deduction from Senmao's EP starting prices on the grounds that the decision was made according to findings unsupported by substantial record evidence.  The court adjudicates the claims on those grounds.

I.  Old Master's Claim Challenging the Assignment of the 13.74% Rate to the Separate-Rate Respondents

In the Final Results, Old Master was assigned the separate-rate margin of 13.74%.  *See Final Results* at 41,478.  Because Commerce calculated a zero margin for Dalian, this rate was based entirely upon the examination of Senmao, the only individually examined respondent that did not receive a zero or *de minimis* rate.  *See Final I&D Mem.* at 52.  Old Master challenges the rate that it was assigned, arguing that Commerce abused its discretion and acted contrary to law by calculating an assessment rate for separate-rate respondents that "roughly quadruple[d] the deposit rate" and that was "untethered to commercial reality."  Old Master's Br. 2.  Old Master contends that it was unreasonable in this case for Commerce to calculate the separate rate by using a method for calculating the "all-others" rate that is used in investigations because the rate here was based on a single mandatory respondent, "a clearly non-representative sample," which resulted in a rate that does not reflect "commercial reality."  *Id.* at 3-4.  For the reasons discussed below, the court rejects this claim.

Paragraph (1) of subsection 777A(c) of the Tariff Act requires that Commerce "shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise."  19 U.S.C. § 1677f-1(c)(1); *see also* 19 U.S.C. § 1675(a)(1)(B).  An exception to this general requirement is contained within the same subsection, which reads as follows:

> If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to--
>
> (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or

(B) exporters and producers accounting for the largest volume of the subject
merchandise from the exporting country that can be reasonably examined.

*Id.* § 1677f-1(c)(2).  When Commerce has invoked this exception, it necessarily must establish

margins for the unselected respondents that remain subject to the review by a means other than

an individual examination.  In administrative reviews involving products from a nonmarket

economy country, the statute is silent as to how Commerce must establish a rate for these

unselected respondents.  To "fill the statutory gap, Commerce generally follows the method for

determining the all-others rate in market economy investigations."  Def.'s Br. 47.  That method,

which applies to investigations, rather than reviews, is outlined in 19 U.S.C. § 1673d(c)(5)(A),

which sets forth a general rule under which Commerce is to base the all-others rate on "the

weighted average of the estimated weighted average dumping margins established for exporters

and producers individually investigated, excluding any zero and de minimis margins, and any

margins determined entirely under section 1677e of this title" (i.e., determined entirely according

to facts otherwise available).  19 U.S.C. § 1673d(c)(5)(A).  The Department followed its practice

here and assigned to the separate-rate respondents that were not individually examined a rate of

13.74%, which was the only rate calculated for an individually examined respondent that was not

zero or *de minimis*.  *See* Def.'s Br. 47.

Old Master argues that Commerce should not have applied its normal procedure because,

after excluding Dalian Dajen's zero margin, the separate rate was based upon only one

individually examined respondent.  *See* Old Master's Br. 3.  According to Old Master, using the

rate of only one individually examined respondent is not representative of those respondents that

were not individually examined and is not "logically connected" to the "commercial reality" of

the separate-rate respondents.  *See id.* at 3-4.  These arguments are without merit.

Old Master appears to base its "commercial reality" argument on the fact that the 13.74% rate "roughly quadruple[d] the deposit rate." Old Master's Br. 2. The cash deposit rate, though, is only an "estimated" rate, consistent with the retrospective statutory scheme for assessment of antidumping duties, under which Commerce, at a later time, determines the amount of antidumping duty that actually is to be assessed and collected upon the liquidation of entries of subject merchandise. *See* 19 C.F.R. § 351.212(a) ("[T]he United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported.").

Old Master posits that the 13.74% rate is "non-representative" because it is based on an examination of a single mandatory respondent. Old Master's Br. 4. At no point during the administrative review did Old Master contest the selection of the mandatory respondents or argue that Senmao was not a suitable candidate. Because Senmao was one of the "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country," *see* 19 U.S.C. § 1677f-1(c)(2)(B), its pricing practices are presumptively representative of the other exporters and producers of subject merchandise. Old Master has not put forth a convincing reason why Senmao should not be presumed to be representative of the other exporters and producers of subject merchandise.

Finally, Old Master does not point to any provision of the statute that Commerce violated in assigning to it an all-others rate based upon the rate of the only individually examined respondent that did not receive a zero or *de minimis* margin. While Old Master is correct that 19 U.S.C. § 1673d(c)(5)(A) explicitly applies to investigations, the Court of Appeals has reasoned that "the statutory framework [of § 1673d] contemplates that Commerce will employ the same methods for calculating a separate rate in periodic administrative reviews as it does in

initial investigations." *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1352

(Fed. Cir. 2016) (citing 19 U.S.C. § 1675(a)).  In sum, Old Master has not shown that the

Department, in assigning to it an all-others rate based upon the rate of the only individually

examined respondent to not receive a zero or *de minimis* margin, acted unlawfully.

Nevertheless, because Old Master was a separate-rate respondent in the review and a plaintiff in

this consolidated action, it is eligible to benefit from any final redetermination of the rate to be

applied to separate-rate respondents as a result of this litigation.

### J.  Claims of the Penghong Plaintiffs that Commerce Unlawfully Conducted a Review of Shenyang Haobainian Wooden Co., Ltd.

Shenyang Haobainian Wooden Co., Ltd. was a separate-rate respondent in the second

review and, therefore, was assigned the 13.74% rate.  Shenyang Haobainian Wooden Co., Ltd.

and the other Penghong Plaintiffs claim that Commerce unlawfully conducted the administrative

review of Shenyang Haobainian Wooden Co., Ltd. in the absence of a timely request for a

review of this company.  Penghong's Br. 3-9.  In support of their claim, the Penghong Plaintiffs

assert that the petitioner's original request for a review of various producers and exporters,

although timely, sought a review of Shenyang Haobainian Wood Co., not Shenyang Haobainian

Wooden Co., Ltd.  They submit that "[i]n the preliminary results of the first review the

Department determined that Shenyang Haobainian Wood Co. was *not* the same company as

Shenyang Haobainian Wooden Co., Ltd." and that petitioner had been on notice that Shenyang

Haobainian Wooden Co., Ltd. was the correct name of the company.  *Id.* at 7.  According to the

Penghong Plaintiffs, the petitioners' subsequent filing of a request for a review of Shenyang

Haobainian Wooden Co., Ltd. was untimely, having been filed on January 21, 2014, 21 days

after the due date Commerce announced for requesting reviews, which was December 31, 2013.

*Id.* at 6.  The Penghong Plaintiffs claim that Commerce impermissibly accepted this untimely

second request, in violation of its own practice and regulations, and that the review of Shenyang

Haobainian Wooden Co., Ltd. was, therefore, contrary to law.  They seek as a remedy that the

court order the rescission of the review as to that company.  *Id.* at 9.

The court denies relief on two grounds.  First, there has been no showing that any of the

Penghong Plaintiffs other than Shenyang Haobainian Wooden Co., Ltd. has standing to bring this

claim.  Second, as to Shenyang Haobainian Wooden Co., Ltd., which necessarily has standing,

the court denies relief because the record demonstrates a failure to exhaust administrative

remedies.

### 1.  Lack of Demonstrated Standing on the Part of Penghong Plaintiffs Other than Shenyang Haobainian Wooden Co., Ltd.

Because Shenyang Haobainian Wooden Co., Ltd. participated in the second review as a

respondent and was assigned the 13.74% rate, this plaintiff has standing to assert a claim that its

review should not have been conducted.  With respect to the other Penghong Plaintiffs, the

complaint alleges as to standing only that "Plaintiffs are producers and/or exporters to the United

States of MLWF manufactured in China or are U.S. importers into the United States of MLWF

manufactured in China" and that "all Plaintiffs have standing" due to their participation in the

underlying administrative proceeding.  Compl. ¶ 5, *Dalian Penghong Floor Products Co. v.

United States*, No. 15-00236 (Sept. 8, 2015), ECF No. 6.  This general allegation of prudential

standing does not suffice as an allegation of an injury in fact.  Although the Penghong Plaintiffs

include U.S. importers of subject merchandise, their submissions fail to allege that any specific

Penghong Plaintiff was an importer of merchandise produced or exported by Shenyang

Haobainian Wooden Co., Ltd. and had one or more entries of such merchandise that were subject

to the second review.  Absent such a factual allegation, the court has no basis to conclude that the

Penghong Plaintiffs in general were affected adversely by the Department's refusal to rescind the

review of Shenyang Haobainian Wooden Co., Ltd.  The complaint of the Penghong Plaintiffs

alleges an injury in fact sufficient to confer standing only with respect to Shenyang Haobainian

Wooden Co., Ltd.  Therefore, this company is the only plaintiff that may assert the claim in

question, and the parallel claims of all other Penghong Plaintiffs challenging the Department's

conducting a review of Shenyang Haobainian Wooden Co., Ltd. must be dismissed for lack of

standing.

   2.  Failure of Shenyang Haobainian Wooden Co., Ltd. to Exhaust Its Administrative Remedies

       The court is directed to require exhaustion of administrative remedies "where

appropriate."  28 U.S.C. § 2637(d).  Commerce has provided by regulation that the case brief

filed during the administrative proceeding "must present all arguments that continue in the

submitter's view to be relevant to the Secretary's final determination or final results, including

any arguments presented before the date of publication of the preliminary determination or

preliminary results."  19 C.F.R. § 351.309(c)(2).  Here, Shenyang Haobainian Wooden Co., Ltd.

objects to the Department's acceptance of the petitioners' second request for the review but

implicitly acknowledges that the argument was not presented in the case brief.  *See* Consol. Pls.'

Reply Br. 2 (Aug. 11, 2016), ECF No. 104 ("Penghong's Reply Br.") (arguing that its failure to

exhaust should not bar judicial review here); *see also Multilayered Wood Flooring from the*

*People's Republic of China; Submission of the Case Brief on Behalf 27 Chinese Producers*

*and/or Exporters* (Feb. 9, 2015) (P.R. Doc. 391).

       The doctrine of exhaustion of administrative remedies requires, as a general matter, that a

party raising an issue upon judicial review first have presented its arguments to the

administrative agency in the manner the agency requires.  "Simple fairness to those who are

engaged in the tasks of administration, and to litigants, requires as a general rule that courts

should not topple over administrative decisions unless the administrative body not only has erred

but has erred against objection made at the time appropriate under its practice." *United States v.*

*L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).  The court fairly can presume that had the

issue of rescission of the review of Shenyang Haobainian Wooden Co., Ltd. been raised in the

case brief, Commerce, consistent with its ordinary practice and procedure, would have addressed

that issue in the Final Issues and Decision Memorandum, presenting the reasons for any decision

it rendered thereon.  Had this occurred, and the agency's final decision been unfavorable to

Shenyang Haobainian Wooden Co., Ltd., the court would have been presented with a final

decision for judicial review, complete with reasoning incorporated by reference in the Final

Results.  But because the issue was *not* preserved in the case brief—the procedure expressly

required by the agency's regulations—Commerce did not have occasion to set forth in the Final

Results or the incorporated Final Issues and Decision Memorandum a determination on the

question presented.

      Shenyang Haobainian Wooden Co., Ltd. is correct in arguing, as it does in its reply brief,

that failure to exhaust administrative remedies is not jurisdictional and that, accordingly, the

court may exercise discretion as to whether to require exhaustion.  Penghong's Reply Br. 2.  But

it fails to show that in the circumstance presented the court is *required* to excuse the failure to

exhaust its administrative remedies.  Moreover, it presents no reason why the issue could not

have been raised in the case brief, as § 351.309(c)(2) required.  The arguments instead are that

the court should excuse this failure on the ground of futility or should do so on the ground that

the claim is "purely legal in nature."  Penghong's Reply Br. 3.  Although these are grounds that

in some instances have caused courts to excuse the failure to exhaust administrative remedies,

neither suffices in the situation presented by this record.

Regarding futility, plaintiff argues that "[r]aising the rejected argument in the administrative case brief would have been a futile exercise, as Commerce had already made its determination by conducting the administrative review."  Penghong's Reply Br. 3.  This argument is not technically accurate, as the review could not be considered to have been "conducted" prior to issuance of the Final Results.  Before then, Commerce as a procedural matter retained the power to rescind the review of Shenyang Haobainian Wooden Co., Ltd.  The earlier decision to accept the petitioners' second request and proceed with the review was by definition not a final administrative decision, as signified by the case brief procedure of § 351.309(c)(2).  Instead, the initial decision was one Commerce procedurally was free to alter between the issuance of the Preliminary Results and the Final Results.

As to the pure legal question justification, plaintiff argues that its "claim, that Commerce violated its regulations by allowing a change to an administrative review request after the deadline, is purely legal in nature and no additional information is necessary for the Court to decide the issue."  Penghong's Reply Br. 3.  It might be true that "no additional information is necessary" for the court to decide the question presented on the merits, but if it is true it is only because the administrative record contains the factual details bearing on the issue.  That is not the same as saying that only a pure legal question is presented.  Deciding the issue on the merits would require resort to the record for consideration of the specific factual circumstances according to which Commerce reached a decision not to reject the second review request, as reflected in the preliminary results of the second review.  Shenyang Haobainian Wooden Co., Ltd., having declined to pursue the issue in its case brief, allowed that decision to become a final decision as embodied in the Final Results.  Accordingly, it may not challenge the merits of that decision before the court.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court remands the Final Results published

as *Multilayered Wood Flooring From the People's Republic of China: Final Results of*

*Antidumping Duty Administrative Review and Final Results of New Shipper Review; 2012-2013*,

80 Fed. Reg. 41,476 (Int'l Trade Admin. July 15, 2015) for reconsideration, and correction as

appropriate, in accordance with this Opinion and Order, of the Department's decisions on: (1) the

surrogate value for plywood, (2) the surrogate value for overlaying glue, (3) the surrogate cost

for foreign inland freight, (4) the denial of voluntary respondent status to Fine Furniture, and

(5) the deduction from Senmao's EP starting prices for irrecoverable value-added tax.  Upon

consideration of all papers and proceedings in this action, and upon due deliberation, it is hereby

**ORDERED** that the Rule 56.2 motion of plaintiff the Coalition be, and hereby is, granted; it is further

**ORDERED** that the Rule 56.2 motions of plaintiffs Fine Furniture, Senmao, Armstrong, Yingyi-Nature and Jisen Wood, Old Master, and the Penghong Plaintiffs, and plaintiff-intervenor Yihua, be, and hereby are, granted in part and denied in part; it is further

**ORDERED** that the Rule 56.2 motion of plaintiff Lumber Liquidators be, and hereby is, denied; it is further

**ORDERED** that the Final Results be, and hereby are, set aside as unlawful in some respects and remanded for reconsideration and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall issue, within 90 days of the date of this Opinion and Order, a new determination upon remand ("Remand Redetermination") that conforms to this Opinion and Order and redetermines dumping margins as appropriate; it is further

**ORDERED** that plaintiffs, plaintiff-intervenors, and defendant-intervenors may file comments on the Remand Redetermination within 30 days from the date on which the Remand Redetermination is filed with the court; and it is further

**ORDERED** that defendant may file a response to the comment submissions within 15 days from the date on which the last of any such comments is filed with the court.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Chief Judge

Dated:  June 8, 2018
           New York, New York