Slip Op. 20-31

## UNITED STATES COURT OF INTERNATIONAL TRADE

JIANGSU SENMAO BAMBOO AND
WOOD INDUSTRY CO., LTD., et al.,

                Plaintiffs,

    and

GUANGDONG YIHUA TIMBER
INDUSTRY CO., LTD., et al.,

                Plaintiff-Intervenors,

    v.

UNITED STATES,

                Defendant,

    and

COALITION FOR AMERICAN
HARDWOOD PARITY, et al.,

                Defendant-Intervenors.

**Before: Timothy C. Stanceu, Chief Judge**

**Consol. Court No. 15-00225**

## OPINION AND ORDER

[Remanding to the agency for correction a determination issued upon remand in an antidumping duty proceeding involving certain multilayered wood flooring from the People's Republic of China]

Dated:  March 11, 2020

*Jeffrey S. Neeley*, Husch Blackwell LLP, of Washington, D.C., argued for plaintiffs and defendant-intervenors Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., Baishan Huafeng Wooden Product Co., Ltd., Changbai Mountain Development and Protection Zone Hongtu Wood Industrial Co., Ltd., Chinafloors Timber (China) Co., Ltd., Dalian Kemian Wood Industry Co., Ltd., Dalian Qianqiu Wooden Product Co., Ltd., Dasso Industrial Group Co., Ltd., Dongtai Fuan Universal Dynamics, LLC., Dun Hua Sen Tai Wood Co., Ltd., Dunhua City Wanrong Wood Industry Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., Guangzhou Panyu Kangda Board Co.,

Ltd., Hunchun Forest Wolf Wooden Industry Co., Ltd., Jiafeng Wood (Suzhou) Co., Ltd., Jiangsu Guyu International Trading Co., Ltd., Jiangsu Kentier Wood Co., Ltd., Jiangsu Mingle Flooring Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Jiashan HuiJiaLe Decoration Material Co., Ltd., Jilin Forest Industry Jinqiao Flooring Group Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd., Nanjing Minglin Wooden Industry Co., Ltd., Puli Trading Limited, Shanghai Lizhong Wood Products Co., Ltd./The Lizhong Wood Industry Limited Company of Shanghai/Linyi Youyou Wood Co., Ltd., Suzhou Dongda Wood Co., Ltd., Tongxiang Jisheng Import And Export Co., Ltd., Zhejiang Fudeli Timber Industry Co., Ltd., and Zhejiang Shiyou Timber Co., Ltd.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiffs Dunhua City Jisen Wood Industry Co., Ltd. and Yingyi-Nature (Kunshan) Wood Industry Co., Ltd.  With him on the brief were *Alexandra H. Salzman*, *James K. Horgan*, and *Judith L. Holdsworth*.

*Jill A. Cramer*, Mowry & Grimson, PLLC, of Washington, D.C., argued for plaintiff, plaintiff-intervenor, and defendant-intervenor Fine Furniture (Shanghai) Limited.  With her on the brief were *Kristin H. Mowry*, *Jeffrey S. Grimson*, and *Sarah M. Wyss*.

*H. Deen Kaplan*, Hogan Lovells US LLP, of Washington, D.C., for plaintiffs Armstrong Wood Products (Kunshan) Co., Ltd. and Armstrong Flooring, Inc.  With him on the brief was *Craig A. Lewis*.

*Mark R. Ludwikowski*, Clark Hill PLC, of Washington, D.C., for plaintiff and plaintiff-intervenor Lumber Liquidators Services, LLC.

*Ronald M. Wisla*, Fox Rothschild LLP, of Washington, D.C., argued for plaintiffs, plaintiff-intervenors, and defendant-intervenors BR Custom Surface, CDC Distributors, Inc., CLBY Inc., *doing business as* D&M Flooring, Custom Wholesale Floors, Inc., Dalian Penghong Floor Products Co., Ltd., Doma Source LLC, Dunhua City Hongyuan Wooden Products Co., Ltd., Galleher Corporation, HaiLin LinJing Wooden Products, Ltd., Hangzhou Hanje Tec Co., Ltd., Hangzhou Zhengtian Industrial Co., Ltd., Huzhou Chenghang Wood Co., Ltd., Huzhou Fulinmen Imp. & Exp. Co., Ltd., Metropolitan Hardwood Floors, Inc., Mudanjiang Bosen Wood Industry Co., Ltd., Nakahiro Jyou Sei Furniture (Dalian) Co., Ltd., Pinnacle Interior Elements, Ltd., Real Wood Floors, LLC, Shanghai Eswell Timber Co., Ltd., Shanghai Shenlin Corporation, Shenyang Haobainian Wooden Co., Ltd., Shenzhenshi Huanwei Woods Co., Ltd., Swift Train Co., Timeless Design Import LCC, V.A.L. Floors, Inc., Wego Chemical & Mineral Corp., Xuzhou Shenghe Wood Co., Ltd., Zhejiang Dadongwu Greenhome Wood Co., Ltd., Zhejiang Fuma Warm Technology Co., Ltd., Zhejiang Longsen Lumbering Co., Ltd., and Zhejiang Tianzhen Bamboo & Wood Development Co., Ltd. (collectively, the "Penghong Plaintiffs").  With him on the brief was *Lizbeth R. Levinson*.

*John R. Magnus*, Tradewins LLC, of Washington, D.C., for plaintiff, plaintiff-intervenor, and defendant-intervenor Old Master Products, Inc.  With him on the brief was *Sheridan S. McKinney*.

*Jonathan M. Zielinski*, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for plaintiff-intervenor Guangdong Yihua Timber Industry Co., Ltd.  With him on the brief was *Thomas M. Beline*.

*Jeffrey S. Levin*, Levin Trade Law, P.C., of Bethesda, MD, for plaintiff and defendant-intervenor Coalition for American Hardwood Parity.

*Tara K. Hogan*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for defendant United States.  With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director.  Of counsel was *Rachel A. Bogdan*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.  Of counsel on the brief was *Mercedes C. Morno*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Stanceu, Chief Judge:  Before the court is the decision (the "First Remand Redetermination") the International Trade Administration, U.S. Department of Commerce ("Commerce," or the "Department") issued in response to the court's order in *Jiangsu Senmao Bamboo & Wood Indus. Co., Ltd. v. United States*, 42 CIT __, 322 F. Supp. 3d 1308 (2018) ("*Senmao I*").  Final Results of Redetermination Pursuant to Ct. Order (June 3, 2019), ECF No. 145 ("*First Remand Redetermination*").

The court's order in *Senmao I*, 42 CIT at __, 322 F. Supp. 3d at 1350, ordered Commerce to reconsider several decisions made in a published determination concluding an antidumping duty proceeding (the "Final Results").  *Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Results of New Shipper Review; 2012-2013*, 80 Fed. Reg. 41,476 (Int'l Trade Admin. July 15, 2015) ("*Final Results*").  The Final Results concluded the second periodic administrative review of an antidumping duty order on multilayered wood flooring from the People's Republic of China (the "Order"), which applied to the period of December 1, 2012 through November 30, 2013 (the "period of review").

Because the court sets aside as unlawful one of the decisions in the First Remand

Redetermination—the decision to adjust downward the export price of subject merchandise to

account for what Commerce considered to be irrecoverable value-added tax—the court remands

the First Remand Redetermination to Commerce for correction.

## I. BACKGROUND

Background on this consolidated case is presented in the court's previous opinion and is

supplemented herein.  *See Senmao I*, 42 CIT at __, 322 F. Supp. 3d at 1313–16.

In the Final Results, Commerce assigned individually determined weighted-average

dumping margins to two Chinese respondents who produced and exported multilayered wood

flooring (the "subject merchandise"): Dalian Dajen Wood Co., Ltd., to which it assigned a zero

margin, and Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao"), to which it

assigned a margin of 13.74%.  *Final Results*, 80 Fed. Reg. at 41,478.

Commerce assigned the 13.74% rate determined for Senmao to numerous "separate-rate"

respondents (i.e., respondents that Commerce considered to have established their independence

from the government of the People's Republic of China ("China")) that were not selected for

individual examination (the "non-selected companies").  *Id.*; *see also Senmao I*, 42 CIT at __,

322 F. Supp. 3d at 1314.  Senmao and numerous non-selected companies are plaintiffs in this

consolidated case, as is the Coalition for American Hardwood Parity (the "Coalition"), an

association of U.S. producers of multilayered wood flooring.  *See Senmao I*, 42 CIT at __, 322

F. Supp. 3d at 1315.

The changes Commerce made to the Final Results in the First Remand Redetermination

reduced the dumping margin Commerce calculated for Senmao from 13.74% to 6.55%.  *First

Remand Redetermination* 30.  Specifically, Commerce, in response to the court's order in

*Senmao I*, reconsidered and revised the surrogate values it applied to overlaying glue (one of

Senmao's production inputs), *id.* at 11–14, and to Senmao's cost for inland freight, *id.* at 14–17.

Commerce reconsidered, but left unchanged, its surrogate value for another of Senmao's

production inputs, plywood.  *Id.* at 2–11.  Commerce assigned the 6.55% rate to 46 non-selected

companies in the First Remand Redetermination.  *Id.* at 32–34.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c), under which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended*, 19 U.S.C. § 1516a,

including an action contesting a final determination concluding an administrative review of an

antidumping duty order.  *See* 19 U.S.C. § 1516a(a)(2)(B)(iii).[1]  In reviewing a final

determination, including a determination made upon remand, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  *Id.* § 1516a(b)(1)(B)(i).  In addition, the court

considers whether the Department's decisions in the Remand Redetermination comply with the

court's order in *Senmao I*.

### B. Contested and Uncontested Decisions in the First Remand Redetermination

No party commented to the court in opposition to the decisions Commerce made in the

First Remand Redetermination pertaining to the surrogate values for overlaying glue, inland

---

[1] Except where otherwise indicated, citations to the United States Code herein are to the 2012 edition.

freight, and plywood.  Concluding that they comply with the order in *Senmao I*, the court

sustains these decisions.

Parties contested two decisions in the First Remand Redetermination.  The first is the

Department's decision not to address the issue of whether Fine Furniture (Shanghai) Limited

("Fine Furniture"), an unexamined separate rate respondent, should have been examined

individually as a "voluntary respondent" in the administrative review culminating in the Final

Results.  Fine Furniture commented in opposition to this decision.  Pl.-Int. Fine Furniture

(Shanghai) Ltd.'s Comments on June 3, 2019 Final Results of Redetermination Pursuant to Ct.

Order (July 3, 2019), ECF No. 148 ("Fine Furniture's Comments").  The second is the

Department's decision to maintain certain deductions from the prices used to calculate the

"export price" of Senmao's subject merchandise.  Commerce made these deductions in the Final

Results to account for Chinese value-added tax ("VAT").  Several parties commented in

opposition to these deductions.  *E.g.*, Senmao Pls.' Comments on Results of Redetermination

Pursuant to Ct. Order from Slip Op. 18-67 2–7 (July 3, 2019), ECF No. 147 ("Senmao's

Comments"); Fine Furniture's Comments 4; Pl.-Ints.' Comments on Results of Remand

Redetermination (July 3, 2019), ECF No. 149 ("Pl.-Ints.' Comments").  Below, the court

addresses the two issues that remain to be decided in this litigation.

### C. Voluntary Respondent Status for Fine Furniture

In *Senmao I*, the court reviewed the Department's decision in the Final Results to deny

voluntary respondent status to Fine Furniture, held that this decision was contrary to law, and

directed Commerce to reconsider it.  *Senmao I*, 42 CIT at __, 322 F. Supp. 3d at 1334–40.  In the

First Remand Redetermination, Commerce deemed Fine Furniture's claim to be moot because

Fine Furniture has been excluded from the antidumping duty order in response to the decision of

this Court in *Changzhou Hawd Flooring Co. v. United States*, 42 CIT __, 324 F. Supp. 3d 1317

(2018) ("*Changzhou Hawd*"), and, for this reason, concluded that it "is unable to calculate an

individual weighted-average dumping margin for Fine Furniture." *First Remand

Redetermination* 18–19. Commerce did not assign a rate to Fine Furniture in the First Remand

Redetermination.

       Fine Furniture commented in opposition to the Department's disposition of its voluntary

respondent claim, arguing that *Changzhou Hawd* was not a final court action because an appeal

remained pending. Fine Furniture argues that the court should "direct Commerce to revisit Fine

Furniture's voluntary respondent status *if* the ongoing appeal of *Changzhou Hawd* results in Fine

Furniture being brought back under the antidumping order." Fine Furniture's Comments 3.

Defendant replies that "if Fine Furniture is revived as a respondent subject to the order,

Commerce intends to comply with whatever court orders are needed to effectuate the holding of

*Changzhou Hawd*." Def.'s Reply to Comments on Remand Redetermination 12 (July 18, 2019),

ECF No. 150 ("Def.'s Reply"). Defendant adds that "[a]s a practical matter, this might require

that the Court hold the judgment in this case in abeyance pending the final disposition of

*Changzhou Hawd*, so that the Court can retain jurisdiction and issue any necessary orders." *Id.*

at 12 n.2.

       The Court of Appeals issued an opinion in *Changzhou Hawd* on January 20, 2020, in

which it affirmed the decision of this Court excluding Fine Furniture from the Order.

*Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781, 794 (Fed. Cir. 2020). The period

in which a petition for certiorari may be filed will end on April 19, 2020. Because the court is

ordering Commerce to prepare a second remand redetermination to address the value-added tax

issue, as discussed below, the court will be issuing a further decision in this litigation. Therefore,

the court will hold in abeyance any decision on the disposition of Fine Furniture's claim pending

further proceedings in this case.

### D. The Downward Adjustments Made in Determining the Export Price of Senmao's Subject Merchandise to Account for Chinese Value-Added Tax Were Contrary to Law

Section 731 of the Tariff Act, 19 U.S.C. § 1673, provides that an antidumping duty shall

be imposed "in an amount equal to the amount by which the normal value exceeds the export

price [("EP")] (or the constructed export price [("CEP")] for the merchandise."[2]  19 U.S.C.

§ 1673.  Section 772 of the Tariff Act, 19 U.S.C. § 1677a, determines EP (or, where applicable,

CEP) by making certain specified adjustments, upward and downward, to "[t]he price used to

establish export price and constructed export price."  *Id.* § 1677a(c).  In its regulations,

Commerce refers to this unadjusted price for determining EP and CEP as the "starting price."[3]

19 C.F.R. § 351.402(a).

The issue pertaining to Chinese VAT arose from the Department's decision in the Final

Results to apply one of the statutory adjustments to Senmao's starting prices.  Specifically,

Commerce invoked section 772(c)(2)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(2)(B) (the

---

[2] "Export price" ("EP"), which formerly was known as "purchase price," and "constructed export price" ("CEP"), which formerly was known as "exporter's sale price," previously were described by the umbrella term "United States price" or "U.S. price."  The term "U.S. price" is still used to refer generally to either EP or CEP, both of which are calculated for comparison to normal value when Commerce determines a dumping margin.

[3] The starting price for determining EP is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a).  The starting price for determining CEP is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter."  *Id.* § 1677a(b).

"export tax" provision), in calculating Senmao's weighted average dumping margin.  The export

tax provision effects a downward adjustment to the starting price used to determine EP or CEP,

and thus increases a dumping margin, in certain specified circumstances.  The export tax

provision directs Commerce to reduce the EP or CEP starting price by "the amount, if included

in such price, of any export tax, duty, or other charge imposed by the exporting country on the

exportation of the subject merchandise to the United States, other than an export tax, duty, or

other charge described in section 1677(6)(C) of this title."[4]  19 U.S.C. § 1677a(c)(2)(B).

Commerce made the downward adjustments to the starting prices used to determine the

export price of Senmao's subject merchandise to account for what it considered to be amounts of

Chinese value-added tax that were not rebated ("recovered") by reason of the exportation of the

merchandise.  Commerce considered "irrecoverable VAT" to be an "export tax, duty, or other

charge" that China imposed on Senmao's subject merchandise, reasoning that "input VAT" (or

"VAT-in"), a VAT present in the prices paid to Senmao's suppliers of materials used in domestic

production of the subject merchandise, "amounts to a tax, duty, or other charge imposed on

exports" to the extent it is "irrecoverable," i.e., not refunded upon exportation.  *See Senmao I*,

42 CIT at __, 322 F. Supp. 3d at 1342.  Commerce adjusted the starting prices downward by 8%

of the free-on-board ("FOB") price in the sale for export, which Commerce considered to be the

amount of irrecoverable VAT.  *Id.* at __, 322 F. Supp. 3d at 1341.

---

[4] An export tax, duty, or other charge described in 19 U.S.C. § 1677(6)(C) is an export tax, duty, or other charge "levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received."  19 U.S.C. § 1677(6)(C).  A related provision reduces the dumping margin by adding a countervailing duty to the U.S. price.  *Id.* § 1677a(c)(1)(C).  No party claims these "offset" provisions are relevant in this case.

Seven plaintiffs and groups of plaintiffs[5] challenged the downward adjustments

Commerce made in the Final Results.  In *Senmao I*, the court granted relief on the plaintiffs'

claims, holding that record evidence did not support the Department's finding, for purposes of

the export tax provision, that China imposed "an export tax, duty or other charge," in the amount

of 8%, or in any other amount, "on the exportation" of Senmao's subject merchandise to the

United States.  *See id.* at __, 322 F. Supp. 3d at 1340–45.

In the First Remand Redetermination, Commerce maintained the 8% downward

adjustments it made in the Final Results for what it termed "irrecoverable" VAT.  *First Remand

Redetermination* 28–30.  Upon reviewing the First Remand Redetermination, comments thereon,

defendant's reply to the comments, and the administrative record, the court holds that Commerce

misinterpreted the antidumping statute when it used these downward adjustments in calculating

the export price of Senmao's exported subject merchandise.  The downward adjustments were

unauthorized by the statute and resulted in the assignment of erroneous margins to Senmao and

the non-selected companies.

### 1. The Court's Decision on Value-Added Tax in *Senmao I*

In *Senmao I*, the court concluded that the Department's decision to make the deductions

from the EP starting prices based on input VAT was factually deficient in several respects.

First, as to the statutory requirement that the "export" tax, duty, or other charge be

"imposed by the exporting country on the exportation of the subject merchandise," one factual

---

[5] The plaintiffs and groups of plaintiffs contesting the Department's downward adjustment to Senmao's starting prices to account for irrecoverable value-added tax ("VAT") are Yingyi Nature, Jisen Wood, Armstrong, Old Master, Yihua, Fine Furniture, and the Penghong Plaintiffs. *Jiangsu Senmao Bamboo & Wood Indus. Co., Ltd. v. United States*, 42 CIT __, __, 322 F. Supp. 3d 1308, 1340 (2018) ("*Senmao I*").

problem was that, according to uncontradicted record evidence, "input VAT" was not a tax, duty,

or charge paid on the exported merchandise to the government of China by the exporter,

Senmao.  Rather, it occurred as amounts present in the prices of materials Senmao purchased

from its suppliers, who paid the VAT on the materials they supplied.  As the court noted,

"Senmao's questionnaire response explained that it was subject to value-added tax liability on

sales of its finished products (whether sold in the domestic market or for export) but did not pay

to the tax authority a VAT on materials it used in producing its goods."  *Senmao I*, 42 CIT at __,

322 F. Supp. 3d at 1342.  The court added that "Senmao further explained that the VAT of 17%

on the materials was included in the prices it paid for those materials and was available as a

deduction from the liability to the tax authority for 'VAT-out' (output VAT) on the combined

sales, both domestic and export, of the finished products."  *Id.*  The court summarized, "[i]n

other words, the 17% VAT applicable to materials Senmao used in production was VAT paid to

its material suppliers and passed on to Senmao."  *Id.*  Commerce did not convince the court that a

tax on value added that is present in the prices of materials used in all production of the subject

merchandise (i.e., both for domestic sale and export sale) was, as a factual matter, an "*export* tax,

duty, or other charge" or that it was "*imposed by the exporting country* on *the exportation* of the

subject merchandise to the United States," as required for an adjustment under 19 U.S.C.

§ 1677a(c)(2)(B).  19 U.S.C. § 1677a(c)(2)(B) (emphasis added); *Senmao I*, 42 CIT at __, 322

F. Supp. 3d at 1344.

        The court concluded that one factual finding in particular, a finding essential to the

Department's decision, lacked any evidentiary support in the record.  The finding in question

was that under the Chinese VAT scheme, irrecoverable VAT "amounts to" a tax, duty, or other

charge that is not imposed on domestic sales.  *Senmao I*, 42 CIT at __, 322 F. Supp. 3d at 1342.

The uncontradicted record evidence was that China's VAT *is* imposed on domestic sales, and there was no evidence as to these sales that it was rebated, avoided, or otherwise "recovered." *See id*.  The court reasoned that "an input VAT incurred upon the purchase of materials for use in production of goods both for export sale and domestic sale cannot correctly be found to be a tax, duty, or charge that is not imposed on domestic sales."  *Id.* at __, 322 F. Supp. 3d at 1344.  The court continued, "[t]here is no record evidence from which Commerce could find that Senmao's export sales incurred a 'tax duty, or other charge' that its domestic sales avoided" and that "[u]nder the Chinese VAT system as shown by the evidence placed on the record by Senmao, export sales were not treated less favorably than were domestic sales (and in fact were treated more favorably)."  *Id.* at __, 322 F. Supp. 3d at 1345.

Responding to the Department's rationale that input VAT that is incurred on materials used in producing goods in China and not refunded upon exportation of those goods "amounts to" an export, tax, duty, or other charge on the exportation of the goods, the court said that "[s]imply stated, input VAT incurred on materials used in domestic production that is not rebated or refunded upon the sale of the good (whether domestically or to an export market) made from those materials cannot, as a factual matter, 'amount to' something it is not."  *Id.  Senmao I* stated that "the Department's decision to make the deductions from Senmao's EP starting prices for 'irrecoverable' input VAT was erroneous because it was based on a critical finding of fact, i.e., that irrecoverable input VAT did not occur on domestic sales, that was unsupported by record evidence and illogical."  *Id.*  The court added, "[o]n remand, Commerce must reach a new determination that does not have these deficiencies."  *Id.*

### 2. Plaintiffs Are Not Precluded from Challenging the Methodology by which Commerce Applied the Export Tax Provision in the Review

Plaintiffs commenting on the First Remand Redetermination argue, *inter alia*, that Commerce failed to address the issue of whether the Department's methodology is lawful under the statute, arguing that the methodology is inconsistent with certain decisions of this Court holding that the export tax provision of 19 U.S.C. § 1677a(c)(2)(B) does not apply to value-added taxes such as the one at issue in this case. Senmao's Comments 2–7; Fine Furniture's Comments 4; Pl.-Ints.' Comments. Defendant replies that Commerce did not err by declining to address the issue of the validity of the statutory interpretation under which Commerce made the downward adjustments to Senmao's starting prices for VAT. Arguing that the original claim as to the VAT deduction was a claim relating to a lack of substantial evidence and that "the error identified in the Court's remand order was that the conclusion reached was not supported by the factual record," defendant submits that "Commerce cannot be faulted for declining to address an entirely new argument that was neither raised by the parties nor specifically directed by the remand order." Def.'s Reply 14.

The court does not agree with defendant's argument that the commenters are precluded from objecting to the interpretation of 19 U.S.C. § 1677a(c)(2)(B) upon which Commerce based its VAT decision. For judicial review purposes, the First Remand Redetermination is a new agency decision, distinct from the Final Results, and the parties are free to challenge it according to the standard of review, under which the court determines whether the new determination is supported by substantial evidence on the record *and* is otherwise in accordance with law. What is more, in its VAT decision in the First Remand Redetermination, Commerce interpreted § 1677a(c)(2)(B). *First Remand Redetermination* 23 ("[T]he amount of irrecoverable VAT is a positive quantity that increases the company's VAT payable to the government and, thus,

constitutes a cost borne by the exporter.  Thus, *the amount of irrecoverable VAT is, effectively,*

*'an export tax, duty, or other charge' under section 772(c) of the Act* [19 U.S.C.

§ 1677a(c)(2)(B)], and it, therefore, warrants an adjustment to U.S. price." (emphasis added));

*id.* at 24 (characterizing irrecoverable VAT-in as "a cost or expense Senmao incurred by reason

of its exports and, therefore, a cost *that constitutes an export tax or other charge under section*

*772(c) of the Act*" (emphasis added)).  The parties commenting on the First Remand

Redetermination, therefore, are not precluded from objecting that the Department's interpretation

of the export tax provision was contrary to law.

### 3. China's VAT System as Applied to Producers of Multilayered Wood Flooring, Such as Senmao

The tax-related issue presented in this case requires the court to consider the treatment the

Tariff Act accords to different types of taxes imposed by the exporting country that potentially

affect the determination of a weighted-average dumping margin.  The tax specifically at issue is

a value-added tax that China imposed on sales of multilayered wood flooring made in China,

whether sold into the domestic market or for export.  The relevant facts, which pertain to the

characteristics of this tax and how it was imposed on Senmao, as an individually-examined

respondent, are essentially uncontested between the parties and are readily apparent from

uncontradicted evidence on the record.  The court will summarize the material, uncontested facts

in a somewhat simplified form, but in detail sufficient for resolution of the issue presented.

Under the Chinese VAT system in effect during the period of review, the VAT liability of

a producer such as Senmao was calculated by combining the "output VAT" (or "VAT-out") as

calculated for domestic sales and the output VAT as calculated for export sales, and then

deducting from that sum the total input VAT incurred in the purchase prices of all materials used

in the combined production (i.e., for domestic or export sale).[6]  The output VAT on sales of

multilayered wood flooring into the domestic market was calculated at a rate of 17% of the sales

value.  The output VAT on sales for export was calculated at a preferential rate of 8% of the

FOB sales value (with the difference between the two rates sometimes described as the "rebate

rate").

Senmao was entitled to credit the input VAT that it incurred in the purchase of materials

(which typically amounted to 17% of the sale price of the materials) used in all production

toward the output VAT calculated on its combined sales (i.e., the domestic and the export sales)

and carry forward to future periods credits arising if the input VAT incurred in the materials

purchased exceeded the output VAT as calculated on its own sales.

### 4. The Tariff Act Prohibits Downward Adjustments to EP or CEP Starting Prices for Home Market Taxes such as the Value-Added Tax at Issue in this Litigation

This is not the first time the Department's treatment of Chinese VAT has come before

this Court.  *China Manufacturers Alliance, LLC v. United States*, 43 CIT __, __, 357 F. Supp. 3d

1364, 1370–75 (2019) ("*China Manufacturers*"), held that the Department's interpreting the

export tax provision, 19 U.S.C. § 1677a(c)(2)(B), to apply to Chinese value-added tax

contravened plain meaning and failed to consider related provisions of the Tariff Act.  *Qingdao*

---

[6] In *Senmao I*, the court reviewed the record evidence on Senmao's calculation of its output VAT (or "VAT-out") liability, on which Commerce based its finding that irrecoverable input VAT (or "VAT-in") was an export tax that China imposed on the exportation of Senmao's subject merchandise.  *Senmao I*, 42 CIT at __, 322 F. Supp. 3d at 1343.  As applied to Senmao, that calculation was as follows: VAT payable = VAT-out of domestic sales (calculated as 17% of the sales value) + VAT-out on export sales (calculated as 8% of the free-on-board price of export sales) – the total value of VAT-in on all materials used in production.  *Id.*  In the First Remand Redetermination, Commerce does not dispute that this formula is correct and, to the contrary, acknowledges that, as applied to Senmao, it is "the same as" the equation from a governmental notice of VAT issued in 2012 (on which Commerce relies for its finding that Senmao incurred irrecoverable VAT-in by reason of its exports).  *First Remand Redetermination* 21.

*Qihang Tyre Co. v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1329, 1338–47 (2018)

("*Qingdao Qihang*") employed a similar analysis, holding that the Department's interpretation of

the export tax provision was impermissible under step one of an analysis conducted under

*Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*").

Upon analyzing plain meaning and the statutory and legislative history, *Qingdao Qihang*

concluded that "'Congress had an intention on the precise question at issue' that 'must be given

effect.'"  *Qingdao Qihang*, 42 CIT at __, 308 F. Supp. 3d at 1339 (quoting *Chevron*, 467 U.S. at

843 n.9).  "Congress intended that a domestic tax, such as a value-added tax, imposed by the

foreign country on a good or the materials used to produce that good, would *not* result in a

downward adjustment to the EP and CEP starting prices under § 1677a(c)(2)(B)."  *Id.*

       Certain other decisions of this Court, on which defendant relies in part for its argument

supporting the Department's interpretation, interpret the export tax provision differently than did

*China Manufacturers* and *Qingdao Qihang* and reach different results.  Because these other

decisions raise significant issues, the court takes this opportunity to reconsider the statutory

interpretation question presented in *China Manufacturers* and *Qingdao Qihang* and considered

again in this case.  As the court explains later in this Opinion and Order, the decisions reaching a

different result than *China Manufacturers* and *Qingdao Qihang* relied upon reasoning grounded

in step two of a *Chevron* analysis, holding that Commerce reasonably interpreted an ambiguous

export tax provision to include within its scope Chinese value-added tax.  The court grounds the

present analysis in *Chevron* step one.

       *China Manufacturers* and *Qingdao Qihang* correctly applied a *Chevron* step one analysis

to hold that Congress had an intent on the narrow question presented that is binding on the court

as well as Commerce.  Congress addressed home-market taxes of the exporting country, such as

value-added taxes, in a different statutory provision than the export tax provision.  Under the

statutory scheme, such a home-market tax potentially will reduce a dumping margin if

"recoverable," i.e., if rebated or avoided upon exportation.  The statutory scheme, interpreted

according to plain meaning, purpose, and statutory and legislative history, reveals that Congress

could not have intended that such a tax, whether or not recoverable, would also fall within the

scope of the export tax provision so as to increase a dumping margin.  In this case, the Tariff Act

prohibited Commerce from deducting value-added tax from the Senmao starting prices that were

used to determine export price.

### a. The Treatment the Tariff Act Accords to Various Taxes of the Exporting Country

The narrow question presented is whether the export tax provision of the Tariff Act,

19 U.S.C. § 1677a(c)(2)(B), includes within its scope the Chinese value-added tax described

above.  The court concludes that it does not.

Any valid interpretation begins with a careful and thorough reading of the statute.[7]  The

export tax provision names only "export" taxes, duties, and other charges, mentioning no other

type of tax.  It is expressly limited to taxes, duties, and other charges "imposed on the

exportation" of the subject merchandise.  The limiting terms of the export tax provision, even

when the provision is read in isolation, cast doubt on the Department's interpretation.

A thorough analysis also must consider the export tax provision in the context of related

provisions in the Tariff Act.  The Tariff Act addresses other categories of taxes in provisions

outside of the export tax provision.  These other categories of taxes also might be present in the

---

[7] Mr. Justice Frankfurter famously expressed the first three rules of statutory interpretation: "(1) Read the statute; (2) read the statute; (3) read the statute!"  HENRY FRIENDLY, *Mr. Justice Frankfurter and the Reading of Statutes*, *in* FELIX FRANKFURTER THE JUDGE (Walter Mendelson ed., 1964), *reprinted in* HENRY FRIENDLY, BENCHMARKS 196, 202 (1967).

starting price for determining EP or CEP but are treated differently than export taxes.  They

include value-added taxes of the type at issue in this case, and they have certain characteristics in

common.  They may be described as "domestic" or "home-market" taxes in that they apply to

domestic merchandise and potentially affect sales of merchandise for export as well; for this

reason, they are of a type of tax that is capable of being rebated, or not collected (i.e., avoided),

by reason of exportation of the subject merchandise, whether or not they are rebated or avoided

in a particular instance.  Unlike the export tax provision, these other provisions do not increase a

dumping margin; instead, they potentially reduce one.

      As *China Manufacturers* explained, the Tariff Act makes certain adjustments to U.S.

price (whether calculated by EP or CEP), and to normal value, to achieve a "tax neutral"

comparison between U.S. price and normal value.  For example, the statute upwardly adjusts

U.S. price, and thereby reduces a dumping margin, "to account for import duties imposed by the

country of exportation that have been rebated (i.e., through duty drawback), or not collected, by

reason of the exportation of the merchandise to the United States."  *China Manufacturers*,

43 CIT at __, 357 F. Supp. 3d. at 1370 (citing 19 U.S.C. § 1677a(c)(1)(B)).[8]  "Such duties are

added to the U.S. price to allow a tax-neutral comparison with the home market price of the

foreign like product, which presumably includes import duties, such as duties on materials used

in production in the exporting country."  *Id.*  The opinion further explained that "[i]f the import

duties are 'irrecoverable,' i.e., not rebated or avoided by reason of the exportation, the duties

presumably are included in the U.S. price, and no upward adjustment or downward adjustment is

---

[8] The import duties provision increases U.S. price, and thereby reduces a dumping margin, by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."  19 U.S.C. § 1677a(c)(1)(B).

made, the price comparison already being tax-neutral." *Id.* Accordingly, the Tariff Act does not

provide that irrecoverable import duties present in the EP or CEP starting price will increase a

dumping margin.

Other domestic taxes in the exporting country to which the exported subject merchandise,

or the materials used to produce it, have been subjected, such as value-added taxes, are treated in

much the same way as import duties. *See id.* These may reduce, but do not increase, a dumping

margin. Like an import duty, a value-added tax imposed domestically by the exporting country

may reduce a dumping margin to the extent it is rebated or avoided upon exportation.

Specifically, under the "home-market" tax provision, home-market taxes, such as value-added

taxes, that are present in the prices of the foreign like product are presumed not to be included in

U.S. price to the extent they have rebated, or not collected, on the exported subject merchandise.

To achieve a tax-neutral comparison between U.S. price and normal value, these "recoverable"

value-added taxes are removed from the calculation of normal value, and thus reduce a dumping

margin, to the extent they are added to or included in the price of the foreign like product (which,

after adjustment, is compared to the U.S. price (either EP or CEP).[9]

Another provision in the Tariff Act accomplishes the same purpose of reducing normal

value, and thus of reducing a dumping margin, to achieve a tax-neutral comparison with U.S.

price, where normal value is determined according to constructed value. *See* 19 U.S.C.

§ 1677b(e) ("the cost of materials shall be determined without regard to any internal tax in the

---

[9]  Specifically, the home-market tax provision, set forth in section 773(a)(6)(B)(iii) of the
Tariff Act, excludes from the calculation of normal value, and thus reduces a dumping margin,
for "the amount of any taxes imposed directly upon the foreign like product or components
thereof which have been rebated, or which have not been collected, on the subject merchandise,
but only to the extent that such taxes are added to or included in the price of the foreign like
product." 19 U.S.C. § 1677b(a)(6)(B)(iii).

exporting country imposed on such materials or their disposition that is remitted or refunded

upon exportation of the subject merchandise produced from such materials")[10]; *see also*

19 U.S.C. § 1677b(a) ("a fair comparison shall be made between the export price or constructed

export price and normal value").

The export tax provision of section 772(c)(2)(B) of the Tariff Act, 19 U.S.C.

§ 1677a(c)(2)(B), is the opposite of the import duty, home-market tax, and constructed value

provisions discussed above.  Rather than potentially reduce a dumping margin, as those

provisions do, it potentially increases a dumping margin.  The provision has the specific

limitations highlighted previously: a tax subject to it must be an "export" tax, duty, or other

charge, and it must be imposed by the exporting country "on the exportation of the subject

merchandise to the United States."  Because a tax falling within the export tax provision is one

that is imposed *on* exportation, by definition it cannot be an internal, domestic tax.  For the same

reason, it is one that is not present in the home-market price of the foreign like product.

Removal from the EP or CEP starting price, therefore, allows a tax-neutral comparison between

U.S. price and normal value.  In these respects, the statute distinguishes a tax subject to the

export tax provision from an import duty and from a tax that is imposed on value added within

the exporting country.

### b. Statutory and Legislative History

The statutory history of the home-market tax provision and export tax provision confirms

that Congress never intended for the export tax provision to apply to domestic value-added taxes

---

[10] A 2015 technical amendment made a non-substantive change to the text of this
provision, substituting the words "that is" for the words "which are."  Trade Preferences
Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362.

such as the one at issue here.  As discussed in *Qingdao Qihang*, *see* 42 CIT at \_\_,

308 F. Supp. 3d at 1340–43, and *China Manufacturers*, *see* 43 CIT at \_\_, 357 F. Supp. 3d at

1372–73, the home-market tax provision in current law is derived from a similar provision in an

earlier version of the statute, enacted as part of the Trade Agreements Act of 1979 ("TAA"),

Pub. L. No. 96-39, 93 Stat. 144, which also potentially lowered a dumping margin for

recoverable home market taxes (including value-added tax), but it did so by increasing U.S. price

rather than by reducing normal value.  This earlier version of the home-market tax provision

stood alongside the import duty provision and the export tax provision in 19 U.S.C. § 1677a.  In

the TAA version of the statute existing prior to amendment by the Uruguay Round Agreements

Act of 1994 ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809, section 772(d) of the Tariff Act,

19 U.S.C. § 1677a(d), read, in pertinent part, as follows:

> The purchase price [now called "export price"] and the exporter's sales
> price [now called "constructed export price"] shall be adjusted by being—
>
> (1) increased by—
>
>         \* \* \*
>
>  (B) the amount of any import duties imposed by the country of
> exportation which have been rebated, or which have not been
> collected, by reason of the exportation of the merchandise to the
> United States;
>
>  (C) the amount of any taxes imposed in the country of exportation
> directly upon the exported merchandise or components thereof, which
> have been rebated, or which have not been collected, by reason of the
> exportation of the merchandise to the United States, but only to the
> extent that such taxes are added to or included in the price of such or
> similar merchandise when sold in the country of exportation;
>
>         \* \* \*
>
> and
>
>         \* \* \*
>
> (2) reduced by—
>
>         \* \* \*

> (B) the amount, if included in such price, of any export tax, duty,
> or other charge imposed by the country of exportation on the
> exportation of the merchandise to the United States other than an
> export tax, duty, or other charge described in section 1677(6)(C) of
> this title.

19 U.S.C. § 1677a(d) (1982). It was well established that the home-market tax provision as set

forth in the TAA version of the Tariff Act included within its terms an internal, domestic VAT

that was imposed on the exported subject merchandise (or components thereof) by the country of

exportation, and that it had the potential to adjust the dumping margin downward to the extent

the domestic VAT was rebated or not collected by reason of exportation. *See Federal-Mogul*

*Corp. v. United States*, 63 F.3d 1572, 1576 (Fed. Cir. 1995) ("*Federal-Mogul*"); *Daewoo*

*Electronics Co. v. Int'l Union of Electronic, Electrical, Technical, Salaried & Mach. Workers,*

*AFL-CIO*, 6 F.3d 1511, 1514 (Fed. Cir. 1993). The Court of Appeals for the Federal Circuit has

referred to the provision as the "adjustment for Home market (HM) taxes." *Federal-Mogul*, 63

F.3d at 1574. Because Congress, in the home-market tax provision, addressed domestic taxes

such as value-added taxes, i.e., "taxes imposed in the country of exportation directly upon the

exported merchandise or components thereof," it is contrary to reason to presume that Congress

intended to address them again in the export tax provision.

It is also contrary to plain meaning. Congress used different language in the TAA

version of the statute to distinguish export taxes from import duties and the taxes potentially

coming within the scope of the home-market tax provision. While various types of taxes,

including value-added taxes, that were "imposed in the country of exportation directly upon the

exported merchandise or components thereof," 19 U.S.C. § 1677a(d)(1)(C) (1982), could fall

within the home-market tax provision of the TAA, a tax subject to the TAA's export tax

provision was an "export" tax, duty, or other charge and was imposed "on the *exportation* of the

merchandise."  Having used different language to describe these categories, Congress must be

presumed to have had a different intent as to each.  Moreover, Congress provided for opposite

results: a home-market tax such as a VAT potentially would lower a dumping margin (as would,

potentially, an import duty), and an export tax potentially would raise one.  Reading the two

provisions as overlapping not only would be contrary to logic and plain meaning but also would

lead to an absurd result: the same home-market tax, if recoverable in part by reason of

exportation, could simultaneously raise and lower a dumping margin.  In summary, under any

reasonable interpretation of 19 U.S.C. § 1677a as it existed following enactment of the TAA, the

export tax provision and the home-market tax provision were intended to be mutually exclusive.

Specifically, a tax within the scope of the home-market tax provision, including a value-added

tax of the type at issue in this case, could not also be within the scope of the export tax provision.

Taxes described by the home-market tax provision and the import duty provision of the

TAA differed in another way from the export taxes, duties, and other charges that fell within the

scope of the export tax provision.  Home-market taxes and import duties were ones that were

*capable* of being rebated or avoided by reason of exportation of the merchandise subject to the

antidumping duty order, i.e., the subject merchandise, even if they were not rebated or avoided in

fact.  *See* 19 U.S.C. §§ 1677a(d)(1)(B) (import duty provision), 1677a(d)(1)(C) (home-market

tax provision), 1677b(e)(1)(A) (constructed value provision) (1982).  These were, necessarily,

"domestic" taxes of the exporting country that also potentially affected merchandise sold for

export.  On the other hand, a tax falling within the scope of the export tax provision would not

appear to be one that could have been rebated or avoided by reason of exportation.  That is, a tax

imposed "*on* the exportation of the subject merchandise to the United States," 19 U.S.C.

§ 1677a(d)(2)(B), would not be rebated or avoided *by reason of* exportation of that same

merchandise.  Because only a home-market domestic tax that also falls upon sales for export can

be "recoverable" upon exportation, under the TAA version of the Tariff Act there was no such

thing as a "recoverable" export tax, duty, or other charge.

Notably, Congress used language in the TAA home-market tax provision (and in the

import duty provision as well) indicating its familiarity with the concepts of recoverable and

irrecoverable taxes.  While providing that recoverable import duties and recoverable home-

market taxes potentially would lower a dumping margin, it made no provision under which an

irrecoverable portion of such a tax or duty would raise one.

In summary, the TAA version of the Tariff Act placed home-market taxes (such as value-

added taxes) in a different category than it placed export taxes, duties and other charges.  As

discussed below, that distinction continues in the current statute.

In the URAA, Congress converted the home-market tax provision from one that allows

an upward adjustment to U.S. price to one that allows a downward adjustment to normal value.[11]

---

[11] An issue concerning the "multiplier effect" arose concerning the TAA version of the home-market tax provision.  This issue, and the Department's attempts to respond to it to achieve a tax-neutral comparison, is provided in *Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1576–78 (Fed. Cir. 1995); *see also Zenith Electronics Corp. v. United States*, 988 F.2d 1573, 1578 (Fed. Cir. 1993).  Although it does not mention the multiplier effect, the Statement of Administrative Action for the URAA explained as follows the reason for another change from the TAA version to the URAA version:

> The deduction from normal value for indirect taxes constitutes a change from the existing statute.  The change is intended to ensure that dumping margins will be tax-neutral.  The requirement that the home-market consumption taxes in question be "added to or included in the price" of the foreign like product is intended to insure that such taxes actually have been charged and paid on the home market sales used to calculate normal value, rather than charged on sales of such merchandise in the home market generally.  It would be inappropriate to reduce a foreign price by the amount of the tax, unless a tax liability had actually been incurred on that sale.

(continued . . .)

URAA § 224.  In making this change to the home-market tax provision, Congress intended that

there be no change to the scope of the export tax provision, which was left materially

unchanged.[12]  The Statement of Administrative Action accompanying the URAA confirms this

point.[13]  In summary, Congress intended in the TAA version of the Tariff Act that the export tax

provision would not apply to value-added taxes imposed on production of a good within the

country of exportation, whether or not recoverable upon exportation.  As the language of the

statute and the legislative history make clear, that same intent was carried over to the URAA

version, which is in effect today.

        The margin-reducing adjustment to normal value provided for in the current home-

market tax provision, which resulted from the URAA amendments, is not available where

normal value is determined otherwise than according to the price at which the foreign like

product is sold in the comparison market (normally, the home-market of the exporting country).

That is the situation in the review at issue in this case, which involved goods exported from

China.  Considering China to be a non-market economy country, Commerce determined normal

value according to the "surrogate value" factors-of-production procedures of 19 U.S.C.

---

(. . . continued)
Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R.
Rep. No. 103-316, Vol 1. at 157 (1994) ("SAA"), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4166.
The TAA version of the home market tax provision required for a margin-reducing adjustment
that the taxes be "added to or included in the price of such or similar merchandise when sold in
the country of exportation."  19 U.S.C. § 1677a(d)(1)(C) (1982).

        [12] The URAA made non-substantive changes to the export tax provision, substituting the
term "exporting country" for the term "country of exportation" and inserting the word "subject"
before the word "merchandise" (the latter change occurring throughout § 1677a).

        [13] SAA at 822–23, 1994 U.S.C.C.A.N. at 4163 (instructing, as to the export tax provision
and the other adjustments related to U.S. price that were carried over to the URAA, that "[t]hese
adjustments have not changed from current law").

§ 1677b(c).  Under these procedures, according to which normal value is not determined by the

price of the foreign like product, no margin-reducing, downward adjustment to normal value for

recoverable VAT can be available.  This does not mean Commerce was free to invoke the export

tax provision to make an *upward* adjustment to Senmao's dumping margin for a Chinese VAT,

whether or not Commerce found that tax to be irrecoverable.  Congress, having understood that

home-market taxes such as value-added taxes (like import duties) could be either recoverable or

irrecoverable upon exportation, provided certain tax-related adjustments to prices but did not

provide or intend that home-market taxes on value added to the subject merchandise in the

exporting country, whether or not recoverable, would increase a dumping margin.

The fact that VAT might be present in the EP or CEP starting price does not alter the

court's conclusion.  Commerce is no more empowered by the statute to increase a dumping

margin for Chinese VAT present in the EP or CEP starting price than it would be to increase a

dumping margin for import duties, excise taxes, or any other types of domestic taxes that

Commerce might find to be present in that price.  Only an "export" charge that is "imposed on

the exportation of the subject merchandise to the United States" may be the subject of such a

margin increase under the export tax provision.[14]

---

[14] Commerce justified its interpretation of the export tax provision on the ground that deducting irrecoverable VAT from the EP and CEP starting prices achieved a tax-neutral dumping margin, normal value having been calculated on a tax-free basis in this non-market economy country proceeding.  *First Remand Redetermination* 30.  Later in this Opinion and Order, the court addresses this rationale, explaining that under the Tariff Act, the determination of EP or CEP in general, and the application of the export tax provision in particular, is not affected by the manner in which Commerce calculates normal value.

### c. Relevant Characteristics of China's Value-Added Tax

On the uncontradicted facts in the record, including those acknowledged by Commerce itself, the Chinese value-added tax at issue in this case is a tax imposed on Chinese domestic production and subsequent sale of a good, regardless of whether the sale is into domestic commerce or for export.  As Commerce recognized in the First Remand Redetermination, and as the court discussed previously, a Chinese producer incurs potential liability for Chinese VAT according to a formula in which total input VAT incurred in the prices of the total materials used in all domestic production (i.e., for domestic sale or for export) is applied as a credit against total output VAT, which is the sum of the output VAT as calculated on the sales for the domestic market and the output VAT calculated on export sales.  *See First Remand Redetermination* 21–22.  Thus, VAT-in and VAT-out are elements in the unitary calculation of the total VAT owed by a Chinese domestic producer, whether or not that producer is also an exporter.  Because Chinese VAT is a home-market tax applying to domestic production of a good, it is one that, by definition (and in contrast to an export tax), is *capable* of being rebated or avoided by reason of exportation of that good (regardless of whether, under the product-specific tax provision applicable to that good, it actually is rebated or avoided by reason of exportation).[15]

---

[15] As applied to production in China of multilayered wood flooring, Chinese VAT actually *is* rebated or avoided, in whole or in part, by reason of exportation.  This is apparent from the Chinese VAT formula as Commerce presented it.  *See First Remand Redetermination* 21–22.  Output VAT on the domestic sales of this good was calculated at 17% of the price, and the output VAT on the sales for export was calculated at a preferential rate of 8% of price. Under the VAT formula, a producer that exports a sufficiently large portion of its production might have incurred sufficient input VAT in the prices of its materials (incurred at rates higher than 8%, such as the 17% found applicable in this case) so as to have no VAT liability to the government of China.  In this instance, Commerce acknowledged that Senmao's net VAT payable was negative for the POR.  *Id.* at 23.

### d. The Department's Interpretation of the Export Tax Provision, as Explained in the First Remand Redetermination, Cannot Be Sustained

In the First Remand Redetermination, Commerce gave three reasons in support of the deductions it made from Senmao's EP and CEP starting prices.  The court does not find these reasons convincing.

Commerce concluded, generally, that "the amount of irrecoverable VAT is, effectively, an 'export tax, duty, or other charge' under section 772(c) of the Act, and it, therefore, warrants an adjustment to U.S. price."  *First Remand Redetermination* 23.  Commerce explained, second, that "[h]ere, although Senmao reported a negative VAT payable to the government during the POR, the resultant tax credit it could carry forward under Chinese law and apply against future VAT payable to the government was unambiguously reduced by irrecoverable VAT-in—a cost or expense Senmao *incurred by reason of its exports*—and therefore constitutes an export tax or other charge under section 772(c) of the Act."  *Id.* at 29–30 (emphasis added).  Finally, Commerce reasoned that "its adjustment of EP/CEP for irrecoverable VAT is reasonable and provides for a tax-neutral dumping margin."  *Id.* at 30.

Commerce erred first in reasoning that "irrecoverable VAT" is an "export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States."  As the court has explained, Congress addressed value-added taxes in the home-market tax provision and did not intend that a value-added tax also could fall within the scope of the export tax provision, the two provisions being mutually exclusive.  Moreover, the home-market tax provision, both as set forth in the TAA and URAA versions of the Tariff Act, demonstrates congressional awareness of the concepts of recoverable and irrecoverable value-added tax.  Thus, the value-added tax China imposed on exports of multilayered wood flooring

does not fall within the scope of the export tax provision regardless of the extent to which Commerce regards it as "recoverable" or "irrecoverable."

The Department's rationale that irrecoverable VAT "constitutes an export tax or other charge under section 772 of the Act" because it is "a cost or expense Senmao incurred by reason of its exports" is unconvincing as well. As the uncontested facts demonstrate, and Commerce recognized, a Chinese exporter of multilayered wood flooring incurs potential liability for output VAT on all sales. Export sales did not incur output VAT liability from which domestic sales are exempt (and, in this instance, export sales received preferential tax treatment). Commerce views an irrecoverable value-added tax as a "cost" because it does not reduce potential tax liability in the way a recoverable value-added tax does. That does not make the irrecoverable portion of a value-added tax an "export" tax imposed on "exportation." The Tariff Act treats an irrecoverable VAT (and an irrecoverable import duty) as a domestic tax that does not potentially reduce a dumping margin, as a recoverable VAT potentially does (and as a recoverable import duty does). The Tariff Act does not treat irrecoverable VAT as an export tax simply because it is irrecoverable.

In support of its rationale that Chinese input VAT is subject to the export tax provision because it is a cost borne by the exporter, Commerce quoted *Aristocraft of Am. LLC v. United States*, 43 CIT __, 380 F. Supp. 3d 1324 (2019) ("*Aristocraft II*"). *First Remand Redetermination* 30 ("[I]n *Aristocraft* [*II*], the CIT found that: 'Commerce reasonably found that subject merchandise EP and CEP must be directly reduced by the irrecoverable VAT because irrecoverable VAT, as set forth in Chinese law, reduces the input VAT offset that serves to limit Shanghai Wells' overall VAT liability.'"). The opinion defendant cites does not discuss the statutory construction issue of whether the export tax provision is reasonably interpreted to

increase a dumping margin for a value-added tax imposed by the exporting country.  An earlier

decision in the same litigation, issued in 2017, applying step two of an analysis under *Chevron*,

found reasonable the Department's methodology treating Chinese irrecoverable VAT as the basis

for a margin-increasing adjustment under the export tax provision.  *Aristocraft of Am., LLC v.

United States*, 41 CIT __, __, 269 F. Supp. 3d 1316, 1321–26 (2017) ("*Aristocraft I*").

*Aristocraft I* predated the previously-discussed opinions in *Qingdao Qihang* and *China

Manufacturers* and, therefore, does not address the grounds upon which those opinions held the

Department's statutory interpretation impermissible.  It relies principally upon two earlier

decisions of this Court, *Jacobi Carbons AB v. United States*, 41 CIT __, 222 F. Supp. 3d 1159

(2017) ("*Jacobi AR7 I*")[16] and *Juangcheng Kangtai Chem. Co. v. United States*, No. 17-3, 2017

WL 218910 (Ct. Int'l Trade 2017), and on a Federal Register notice published in 2012, in which

Commerce announced that it would "implement a methodological change to reduce export price

or constructed export price in certain non-market economy ('NME') antidumping proceedings by

the amount of export tax, duty, or other charge, pursuant to section 772(c)(2)(B) of the Tariff Act

of 1930, as amended ('the Act')," *Methodological Change for Implementation of Section

772(c)(2)(B) of the Tariff Act of 1930, as Amended, in Certain Non-Market Economy

Antidumping Duty Proceedings*, 77 Fed. Reg. 36,481–82 (June 19, 2012) ("*Methodological

Change*").  *See Aristocraft I*, 41 CIT at __, 269 F. Supp. 3d at 1321–26.

---

[16] "AR" stands for "administrative review" and the number next to "AR" indicates which administrative review the case concerns.  Therefore, *Jacobi Carbons AB v. United States*, 41 CIT __, 222 F. Supp. 3d 1159 (2017) ("*Jacobi AR7 I*") and *Jacobi Carbons AB v. United States*, 43 CIT __, 365 F. Supp. 3d 1323 (2019) ("*Jacobi AR7 II*") both stem from an action regarding the seventh administrative review.  *Jacobi Carbons AB v. United States*, 43 CIT __, 365 F. Supp. 3d 1344 (2019) ("*Jacobi AR8*"), discussed *infra*, is a decision concerning the eighth administrative review of the same order.  *Jacobi AR7 II* and *Jacobi AR8* applied identical reasoning to the issue of Chinese VAT.

In *Jacobi AR7 I*, this Court stated that "[t]he ordinary meaning of the term 'imposed' [as used in the export tax provision] demonstrates the reasonableness of Commerce's interpretation. Because the Chinese VAT is refunded in the context of domestic sales but not exports, it constitutes a 'penalty' that is 'applied,' and with which Jacobi is forever 'burdened,' at the time of exportation." *Jacobi AR7 I*, 41 CIT at __, 222 F. Supp. 3d at 1188. The finding that "Chinese VAT is refunded in the context of domestic sales but not exports" is a finding that could not be supported on the record of this case. In any event, a subsequent opinion in the *Jacobi* litigation clarified the relevant factual circumstances of China's VAT system as applied to activated carbon; that opinion did not rest on a finding or inference that export sales of activated carbon were burdened by the VAT system in a way that domestic sales were not. To the contrary, the case involved "output VAT" of 17% that "is equally applicable to domestic and export sales." *Jacobi Carbons AB v. United States*, 43 CIT __, __, 365 F. Supp. 3d 1323, 1339 (2019) ("*Jacobi AR7 II*").

As *Juangcheng Kangtai* and *Jacobi AR7 I* predate *Qingdao Qihang* and *China Manufacturers Alliance*, they do not address the grounds upon which those later opinions held the Department's statutory interpretation impermissible. *Juangcheng Kangtai* and *Aristocraft I*, in applying *Chevron* deference, emphasized the words "export tax, duty, *or other charge*" as used in the export tax provision, concluding that the "other charge" reference is broad enough to encompass the irrecoverable VAT in question. *See Aristocraft I*, 41 CIT at __, 269 F. Supp. 3d at 1322–23. But the question has never been whether China's value-added tax is a "tax." As the uncontradicted facts in this case show, it is just that: a tax imposed on value added to goods produced in China that does not treat export sales less favorably than domestic sales. The term "other charge" is not permissibly read in isolation, as the tax or other charge must be an "*export*

tax, duty, or other charge," and it must be imposed "*on* the exportation of the subject merchandise," in order to come within the bounds of the export tax provision.  It is not enough that the charge be merely a cost that arises as the result of export sales.  Moreover, the relevant tax-related adjustment provisions in the Tariff Act, when read together, and read in consideration of the statutory and legislative history, cause the court to disagree with the conclusion, as stated in *Aristocraft I*, that "Congress has not expressed an unambiguous intent on how Commerce should resolve this issue."  *Id.* at __, 269 F. Supp. 3d at 1322.

　　*Methodological Change* fails to persuade the court that the First Remand Redetermination is lawful, for a straightforward reason: in treating irrecoverable VAT as an export tax, it is contrary to the Tariff Act.  Specifically, the notice concludes, without plausible legal reasoning, that VAT not rebated upon exportation of the subject merchandise is, *per se*, an "export tax, duty, or other charge" within the scope of the export tax provision.  *See Methodological Change*, 77 Fed. Reg. at 36,482 (announcing that Commerce, in non-market economy antidumping duty proceedings, will apply the export tax provision to "VAT that is not fully refunded upon exportation").[17]  The notice fails to put forth an analytically sound statutory interpretation of the export tax provision that addresses plain meaning, statutory history, and legislative history, and it ignores congressional intent that a dumping margin, although possibly reduced for recoverable value-added taxes, would *not* be increased for value-added taxes that are irrecoverable.

----

[17] The rationale for the scope of the notice is not fully explained.  Even though maintaining that an irrecoverable VAT is, by reason of being irrecoverable, within the scope of the export tax provision, Commerce confined the reach of *Methodological Change* to exports from two non-market economy countries, China and Vietnam.  There is no express finding that these are the only two countries in which VAT is irrecoverable upon exportation of the merchandise.

Also unconvincing is the Department's rationale that reducing Senmao's U.S. price for what it regarded as "irrecoverable VAT" is reasonable because it resulted in a tax-neutral calculation of the dumping margin.  In support of this rationale, Commerce cited *Jacobi Carbons AB v. United States*, 43 CIT __, 365 F. Supp. 3d 1344 (2019) ("*Jacobi AR8*").  Commerce stated that "[i]n *Jacobi* [*AR8*], the CIT found that '…adjusting EP/CEP for VAT imposed on export sales allows Commerce to calculate a tax-neutral dumping margin when normal value is calculated exclusive of VAT.'"  *First Remand Redetermination* 30 (quoting *Jacobi AR8*, 43 CIT at __, 365 F. Supp. 3d at 1361).

*Jacobi AR8* involved an "output VAT" of 17% that Commerce found to have been imposed on both export sales and sales to the Chinese domestic market of activated carbon and, as applied to the export sales, determined to be subject to the export tax provision.  The opinion describes the statutory interpretation issue presented in the case as "whether Commerce may apply the statute, 19 U.S.C. § 1677a(c)(2)(B), to a VAT that is equally applicable to domestic and export sales."  *Jacobi AR8*, 43 CIT at __, 365 F. Supp. 3d at 1359.  The opinion holds that the export tax provision, by referring to "export tax[es], dut[ies], or other charge[s] imposed by the exporting country on the exportation of the subject merchandise," 19 U.S.C. § 1677a(c)(2)(B) [the export tax provision], "is ambiguous as to whether the statute applies to such assessments imposed *solely* upon export sales or assessments imposed upon sales *at the time of export*, regardless of whether the assessment is also applied to domestic sales."  *Id.*  The opinion concludes that it was reasonable for Commerce to adopt the latter interpretation, i.e., it was reasonable for Commerce to interpret the export tax provision as applying to assessments

imposed at the time of export—specifically, output VAT—regardless of whether domestic sales were also subject to it.[18]  *Id.*

Having found the export tax provision ambiguous, the opinion in *Jacobi AR8* concluded that the Department's interpretation of the export tax provision was reasonable because "Commerce interpreted section 1677a(c)(2)(B) to permit a reduction to EP/CEP in order to achieve a tax neutral comparison between EP/CEP and normal value."  *Id.* at __, 365 F. Supp. 3d at 1360.  The opinion reasons that "here, normal value is *not* based on home-market (i.e., domestic) sales prices, but is based on the respondent's factors of production and corresponding surrogate values, which are determined on a tax-exclusive basis."  *Id.*  The opinion adds that "[i]n such a case, the principle that dumping margin calculations should be tax-neutral supports Commerce's adjustment."  *Id.*  It states, further, that "[i]n this case, . . . the constructed export price reported by Jacobi includes 17 percent output VAT imposed by the Chinese government, whereas the normal value, to which it is to be compared, is determined using surrogate values that are tax-exclusive."  *Id.* at __, 365 F. Supp. 3d at 1361–62.

The court is unable to agree that the interpretation Commerce placed upon the export tax provision, as ruled upon in *Jacobi AR8*, was a permissible one, even under a review conducted according to step two of a *Chevron* analysis.  The premise that the statute is ambiguous "as to whether the statute applies to such assessments imposed *solely* upon export sales or assessments imposed upon sales *at the time of export*, regardless of whether the assessment is also applied to

---

[18] In agreeing with this particular aspect of the Department's analysis, the opinion in *Jacobi AR8* found support in jurisprudence of the U.S. Supreme Court on the Export Clause in the United States Constitution.  This is an interesting approach to the issue, but, after considering it, the court applies a different analysis in this case.  Because the question presented in this case is one of *statutory* interpretation, the court conducted the analysis presented in this Opinion and Order according to the plain meaning, congressional intent, statutory history, and legislative history of the relevant provisions of the Tariff Act.

domestic sales," *id.* at __, 365 F. Supp. 3d at 1359, addresses only the language of the export tax

provision without considering the other tax-related provisions in the Tariff Act that lend the

export tax provision meaning and context.  "[A] reviewing court should not confine itself to

examining a particular statutory provision in isolation." *Food and Drug Admin. v. Brown &*

*Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).

Even if it were presumed, *arguendo*, that the export tax provision is ambiguous in the

way described in *Jacobi AR8*, the Department's interpretation of the export tax provision as

reviewed in that decision still would be impermissible, for two reasons.

First, as the court discussed previously in this Opinion and Order, the home-market tax

provision contemplates that home-market taxes can be imposed on exported subject merchandise

(and possibly rebated), and no reasonable interpretation of the TAA would place the same tax

within the ambit of that home-market tax provision and also within the ambit of the export tax

provision, the scope of which was not enlarged upon enactment of the URAA.  Because the

output VAT rate for sales to the domestic market and the output VAT rate for sales for export

were the same in the calculation of VAT owed by the producer to the Chinese government, the

VAT scheme as applied in *Jacobi AR8* neither promoted exportation of the subject merchandise

nor penalized it.  In carefully chosen language, Congress took pains to distinguish such a tax

from a tax on exportation itself, which disadvantages export sales.  Under the scheme Congress

established in the Tariff Act (both before and after enactment of the URAA), a tax such as the

one at issue in *Jacobi AR8* would not reduce a dumping margin, but, being outside the intended

scope of the export tax provision, neither would it increase one.  The Department's interpretation

was, therefore, unreasonable in that respect.

Second, the basis upon which *Jacobi AR8* found the Department's statutory interpretation

to be reasonable was that doing so achieved a tax-neutral comparison with normal value, which

Commerce, according to its practice, determined by valuing factors of production on a tax-free

basis. *Jacobi AR8*, 43 CIT at __, 365 F. Supp. 3d at 1361–62. Under the Tariff Act, this was not

a valid rationale. Commerce, in the interest of achieving what it considers to be a tax-neutral

comparison between U.S. price and normal value, is not free to make any margin-increasing (or

margin-reducing) adjustment to U.S. price that it chooses to make. Instead, Commerce must

confine itself to adjustments the statute provides. *See Ad Hoc Committee of AZ-NM-TX-FL

Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 403 (Fed. Cir. 1994);

*Vicentin S.A.I.C. v. United States*, 43 CIT __, __, 404 F. Supp. 3d 1323, 1333–34 (2019). Here,

as elsewhere, Commerce must conform its methodologies to the statutory directives.

Under 19 U.S.C. § 1677a, the adjustments made to the starting price for determining EP

or CEP in general, and any adjustment to these prices made according to the export tax provision

in particular, do not vary according to the method by which Commerce determines normal value.

In applying the adjustment for export taxes, Commerce must decide whether a tax or other

charge imposed by an exporting country either *is*, or *is not*, within the scope of the export tax

provision. The decision must be made according to the express terms of paragraph (c)(2)(B) of

that section. It cannot depend instead on how Commerce is required to determine, or chooses to

determine, normal value—a topic nowhere mentioned in the export tax provision. Instead,

Commerce is to determine whether the charge at issue is, for purposes of 19 U.S.C.

§ 1677a(c)(2)(B), an "*export* tax, duty, or other charge" that is imposed by the exporting country

and whether the exporting country imposed it "*on* the exportation of the subject merchandise."

These necessarily depend on the characteristics of the foreign tax. How normal value is

determined for purposes of U.S. law is irrelevant to the inquiry.  Were it otherwise, the export

tax provision could be given one meaning when the exporting country is found by Commerce to

be a non-market economy country and a contrary one when it is not.  The statutory issue before

the court is a question of law, and Commerce is not free to give the same provision inconsistent

meanings in different factual situations.

As the court has noted, Commerce is not free, for example, to increase a dumping margin

for irrecoverable import duties or irrecoverable home-market taxes that Commerce may find to

be present in the EP or CEP starting price, even though the Department's normal value

calculation, based on factors of production and surrogate values, might not include these taxes or

duties.  Yet, under the rationale for the Department's statutory interpretation as described in

*Jacobi AR8*, Commerce could shoehorn practically any type of tax, duty, or other charge

affecting both domestic and export sales into the export tax provision—and, thereby, use it as a

justification for increasing a dumping margin—so long as the tax or charge is assessed at the

time of exportation and is found to be included in the EP or CEP starting price, and so long as

Commerce considers the exporting country to be a non-market economy country.  Congress

intended otherwise.

In summary, the Department's interpretation of the export tax provision is inconsistent

with the plain language of the provision when interpreted in concert with other tax-related

provisions in the Tariff Act that are relevant to the statutory interpretation issue before the court.

The Department's interpretation is inconsistent with statutory and legislative history and cannot

be justified as a reasonable method of achieving a tax-neutral dumping margin.  Congress had a

clear intent on the narrow question presented: a home-market value-added tax, although

potentially reducing a dumping margin in certain circumstances (not present here), would not

increase one.[19]

### III. CONCLUSION

The Department's decision in the First Remand Redetermination to maintain its

adjustments under 19 U.S.C. § 1677a(c)(2)(B) to the starting prices used to determine export

price was contrary to law in relying upon an invalid interpretation of the Tariff Act, which does

not permit those deductions.  Commerce, therefore, must issue a new determination that does not

commit this error.

Therefore, upon consideration of the First Remand Redetermination and all papers and

proceedings in this action, and upon due deliberation, it is hereby

**ORDERED** that the First Remand Redetermination be, and hereby is, set aside as
unlawful with respect to the decision by Commerce to maintain deductions from the starting
prices under 19 U.S.C. § 1677a(c)(2)(B) for value-added tax; it is further

**ORDERED** that Commerce, within 60 days of the issuance of this Opinion and Order,
shall submit a Second Remand Redetermination that corrects the error the court has identified; it
is further

**ORDERED** that plaintiffs, plaintiff-intervenors, and defendant-intervenors may file
comments on the Second Remand Redetermination within 30 days from the date on which the
Second Remand Redetermination is filed with the court; and it is further

---

[19] In reaching this conclusion, the court does not hold broadly that a VAT could never be
so structured as to fall within the scope of the export tax provision.  A VAT directed solely to
exports (if such a thing actually exists anywhere) would not be a home-market tax and would
raise an issue this case does not present.  In contrast, the VAT giving rise to this dispute, as
shown by the formula for the calculation of VAT owed, applies to sales for domestic
consumption and to sales for export (in this case, at a preferential, lower rate).

**ORDERED** that defendant may file a response to the comment submissions within 15 days from the date on which the last of any such comments is filed with the court.


  /s/ Timothy C. Stanceu        
Timothy C. Stanceu, Chief Judge


Dated: March 11, 2020
       New York, New York